THE STATE, DEFENDANT IN ERROR, v. FRANK BANUSIK, PLAINTIFF IN ERROR.

Argued June Term, 1906—Decided November 19, 1906.

1. In a prosecution for murder, a statement made by the defendant some months before the occurrence of the homicide, which has a tendency (even if slight) to show that at the time of making it he had formed the intention of taking the life of the deceased, is competent evidence against him.

2. A statement made by a defendant prior to the occurrence of a homicide which is corroborative of certain portions of a confession made by him after such occurrence, is competent evidence for the purpose of showing the truthfulness of the confession even though the facts contained in it, standing alone, are irrelevant.

3. In a prosecution for murder the *corpus delicti* may be proved by a confession made by the defendant which is corroborated by other evidence. The law does not require full proof of the body of the crime independent of such confession.

4. The rule is settled in this state that it is entirely proper for a trial judge in a criminal case to comment in his charge to the jury upon the conduct of a defendant in remaining silent when the evidence tends to establish facts which if true would be conclusive of his guilt and he can disprove them by his own oath as a witness; and this is true even though the defendant sees

fit to close his case when the state rests for the purpose of moving for the direction of a verdict of acquittal.

5. In determining upon the legal accuracy of an instruction to the jury it is not permissible to extract a single sentence and construe it without regard to the context in which it appears. The instruction is to be construed as a whole, and the legal principle which was declared thus extracted.

6. An instruction to the jury that an intent to kill, executed the instant after its formation, makes the homicide murder in the first degree, although unsound in law does not constitute harmful error and consequently affords no ground for reversal, where the same proofs which show beyond a reasonable doubt that the homicidal act of the defendant was an intentional one show with equal conclusiveness that the intention was fully formed long before it was carried into execution.

On error to the Essex Oyer and Terminer.

For the plaintiff in error, *James M. Trimble.*

For the state, *Henry Young,* prosecutor of the pleas.

The opinion of the court was delivered by

GUMMERE, CHIEF JUSTICE. The indictment in this case charges the defendant with the willful murder of Thomas Hoff on the eighth day of January last, at the town of Bloomfield, in Essex county. The trial resulted in the conviction of the defendant of murder in the first degree. The entire record of the proceedings had upon the trial has been brought up by the writ of error, pursuant to the one hundred and thirty-sixth section of the Criminal Procedure act of 1898. *Pamph. L., p.* 866.

The following facts, among others, were proved by the state at the trial: The defendant, who was a Pole, was a boarder in the home of Hoff in the town of Bloomfield, and they were in the habit of drinking together on occasion. Some two months before the death of Hoff the defendant instructed the barkeeper of a saloon kept by one Rosenstein, which they at times patronized, to furnish him with water when he called for gin, as he had a bet of five dollars with Hoff that he could drink more liquor than the latter. On the afternoon of

Sunday, the seventh of January, the defendant, with Hoff and a fellow-countryman named Baranoski, left Hoff's house and proceeded to Rosenstein's saloon, which they reached between five and six o'clock. They remained there drinking until about ten o'clock in the evening. The defendant drank gin, which was diluted by the bartender with water. After leaving the saloon they went to Baranoski's house. Hoff, upon arriving there, was so drunk that he was unable to sit in his chair, and fell from it onto the floor. Baranoski proposed to put a coat under his head and "let him sleep until he felt better," but the defendant said, "This is my boarding boss—I will take him home," and took him away from Baranoski's house. They left shortly after midnight. Thereafter no one who knew Hoff, with the exception of the defendant, saw him until about a half hour later, when his mutilated body was discovered on a railroad track a short distance away. About a thousand feet from Baranoski's house a path leads from the avenue upon which it is located to the Delaware, Lackawanna and Western railroad. The road is elevated above the surrounding territory. A few minutes before half-past twelve o'clock on the morning of January 8th, Nicholas Hinz and a companion were passing from Bloomfield to Watsessing, in a southerly direction, upon this railroad track. Hinz saw two men coming along the path referred to, and climbing up the embankment onto the railroad track. After he and his companion had proceeded some distance along the track he heard a noise behind him as of men quarreling, and upon looking back observed the men whom he had previously seen, walking along the embankment. He paid little attention to them, however, but went on his way with his companion. On his return from Watsessing, some twenty or twenty-five minutes later, he saw the dead body of Hoff lying on the eastbound railway track, near the place where he had last seen the two men. A railway train proceeding from Bloomfield to Hoboken, between half-past twelve and one o'clock in the morning, had, in the meantime, passed over the body of Hoff and "crushed off" his legs. As this train, which consisted of an engine and a single freight car, was approaching

the spot where Hoff was afterwards found, the body of a man was seen by the trainmen lying face upward on the track. The emergency brake was immediately applied, but the train passed over him, stopping, however, within a few feet after it had done so. The engine had no cow-catcher, and the bottom of the engine, and that of the car, were elevated about fourteen inches above the ties, affording sufficient clearance room for the train to pass over the body of a man lying flat between the rails, without inflicting injury upon him. After running over Hoff the crew of the train immediately went back to where the body lay, and found that he was still alive, but he died a few minutes later. An autopsy subsequently performed upon the body showed that, in addition to the injury to his legs, Hoff had sustained two extensive fractures of the skull, one on the right side and the other on the back of the head. The character of those fractures, and their appearance, indicated to the experts performing the autopsy that they were produced either by the train which ran over Hoff or by some heavy blunt instrument. After his arrest the defendant made a written confession of the crime with which he is charged, and later, during a conversation which he had with one of the officers in whose presence the written confession was made (and who was a fellow-countryman) he requested him to write to his people in the old country, and tell them that he was sick, and if he should be sentenced to be hanged for the crime, to tell them that he had died a natural death. He also informed the officer that he wanted to marry Hoff's wife and had it in his mind to kill him long ago, and that he picked up a mallet for that purpose, and put it in his inside pocket when he went off Sunday afternoon. He also informed the officer on that occasion, in response to a question asked of him, that he knew there was a train due on Sunday night, because, when he and Hoff were leaving Baranoski's house there was a train going up, and he knew it had to come back again.

The first reason advanced on behalf of the defendant for setting aside the conviction under review is that the trial court erred in permitting the state to prove by the bartender

from Rosenstein's saloon the instructions given by the defendant to him some two months before the killing of Hoff, to serve him (the defendant) with water when he ordered liquor, the ground of objection being that the incident was too remote to have any bearing on the matter in issue, and was, therefore, irrelevant. We are unable to take this view of the testimony. The theory upon which the case was tried by the state was that the motive which induced the defendant to take the life of Hoff was the illicit love which he had for Hoff's wife, and that the intent to kill Hoff was conceived by him a considerable time before it was carried into execution. The fact that he gave the instruction to the barkeeper had some tendency (even if slight) to show that, at that time, he had conceived the idea, and that, for the purpose of consummating it had formulated the plan of reducing Hoff to such a condition of intoxication as to render him incapable of successfully resisting an attack upon him. The evidence was relevant for another purpose. The written confession made by the defendant contains the following statement: "I told the bartender to give me water when I called for gin." The confession fails to disclose when it was that the defendant gave this instruction to the bartender, but the connection in which it appears suggests that it was given in the evening, just preceding the alleged homicide. The confession contains a further statement that the defendant had it in his mind to kill Hoff for about two or three months. The evidence of the barkeeper is confirmatory of the truth of the statement first quoted from the confession, and explanatory of it so far as the time of the giving of the instruction is concerned, for the testimony of the bartender was to the effect that the instruction was not given to him on that evening. The evidence also tends to confirm the truth of the second statement quoted from the confession, that the defendant formed the intention of taking Hoff's life two or three months before carrying it into execution.

The next ground for setting aside the conviction is that the written confession of the defendant was improperly admitted in evidence—*first,* because the statements contained in

the writing were not proved to have been made by the defendant, and *second,* because it was not shown that the confession was voluntarily made by him. The first of these reasons has no support from the facts in the case. The confession was made in the presence of Detective Devita, of the prosecutor's office, and of Police Magistrate Cadmus, Chief of Police Collins and Officers Blum and Shorter. The defendant was interrogated by Devita upon the subject-matters contained in the confession, the questions being put in English. The questions were then translated into Polish, the language spoken by the defendant, by Officer Blum, who was a fellow-countryman of his. The questions were then answered by the defendant in his native language, and his answers translated into English by Blum. Each question and answer was reduced to writing, in English, and in narrative form, by Magistrate Cadmus, as it was asked and given, and then read out by the latter. What was read by the magistrate was then translated into Polish by Blum, and the defendant asked by him if that was right, and the defendant, in each instance, answered that it was. This was done "all the way through," in the language of the witnesses, and when the taking of the confession had been completed, and entirely written out, the writing was signed by the defendant. Blum, upon the witness-stand, testified to the correctness of his interpretation. It is difficult to imagine how a confession could have been reported more accurately, or more care taken to avoid mistake or misunderstanding. A statement similarly taken down was held to be admissible, as the statement of the defendant, by this court, in the case of *State* v. *Abballo,* 35 *Vroom* 660.

The contention that the confession was not voluntarily made is also unsupported by the proofs. It was made at the police station, after the arrest of the defendant for the murder of Hoff. Shortly before it was made, Officer Blum, in a conversation which he had with the defendant in the latter's cell, told him that Mrs. Hoff had informed the authorities that he had killed her husband. After this conversation the defendant was taken from his cell into one of the main rooms of the police station for the purpose of being interrogated by Detec-

tive Devita.  Before the interrogation was begun he was told
by Blum that anything he might say would be used against
him in court, to which he replied, "It is the truth, and nothing
but the truth, so I might as well tell it, as long as you know
it."  The interrogation was then proceeded with in the man-
ner before indicated.  It is not suggested that the confession
was extorted by threat, or obtained by any direct or implied
promises; but it is urged that, because it was made while in
confinement, to an officer of the law, in the presence of a
magistrate, and was elicited by questions put to the defendant,
it should be held not to have been voluntary.  The decisions
of this court, however, are directly opposed to this view.
*Roesel* v. *State,* 33 *Vroom* 216; *State* v. *Hill,* 36 *Id.* 626;
*State* v. *Young,* 38 *Id.* 223; *State* v. *Hernia,* 39 *Id.* 299.
The most that can be said in favor of this contention of the
defendant is that these circumstances are to be taken into
consideration in determining the question whether or not the
confession was voluntarily made.  But when that question is
determined adversely to the defendant by the trial court,
whose function it is to decide it, they, standing alone, afford
no ground for overturning that determination.

The further contention was made that it was error to per-
mit the state to prove the oral admission of guilt made by the
defendant to Officer Blum, and recited in the statement of
facts set out in the earlier part of this opinion.  This was
rested upon the same grounds as the objection to the written
confession, and must fail for the same reasons.

The next reason advanced for setting aside the conviction
is that there is no evidence in the case, except the alleged
confessions of the defendant, to show that Hoff was mur-
dered, and that the law will not permit a conviction in the
absence of independent proof of that fact.  But this, in our
opinion, is not an accurate statement, either of the rule of
law as to the proof required with relation to the *corpus delicti*
or the condition of the evidence upon the question whether a
murder was committed.  Full proof of the body of the crime,
the *corpus delicti,* independently of the confession, is not re-
quired.  It may be proved by the confession itself, corroborated

by other evidence. *People* v. *Badgley,* 16 *Wend.* 53; *Commonwealth* v. *Tarr,* 4 *Allen* 315. The statement made by the defendant in his written confession was that he and Hoff went to Rosenstein's saloon about a quarter before six and stayed there until about a quarter past ten; that he was unable to state how many drinks they had, but that he had only one dollar left from four dollars; that he told the bartender to give him water when he called for gin; that he had three drinks of water; that after he and Hoff left Rosenstein's saloon they stopped in a saloon a block above, where they each took a glass of beer; that they then came out and took a car for Bloomfield, and went to Baranoski's house; that they arrived there shortly before twelve o'clock at night, and had four drinks of whiskey in Baranoski's house; that after they had the drinks Hoff fell off of the chair onto the floor, after which he (the defendant) raised him up and carried him out of the house and took him on the railroad track, and hit him the first blow back of the head; that he must have hit him in the same place the second time, and that Hoff then fell in the middle of the track, and that the defendant left him there; that he got home to Hoff's house about ten or twenty minutes to one o'clock on Monday, January 8th; that he left the club with which he hit him alongside of the body, a lead mallet, which he used in his work at Sprague's factory; that he told her (evidently Mrs. Hoff) not to worry, that he would take care of her; that he had connections with her for over one year, and that he told her that if she was a widow he would marry her in a minute; that he had it in his mind to kill Hoff about two or three months; that he told his wife that he would get rid of him some time, and that Mrs. Hoff told him he could do as he pleased. The facts recited in the early part of this opinion were all testified to by witnesses produced on the part of the state. That they are strongly corroborative of the story told by the defendant is apparent at a glance. They demonstrate the truth of the confession up to the time when the defendant reached the railroad track with Hoff. The fact that the wounds upon Hoff's head were such as might have been inflicted by a mallet,

coupled with the fact that the construction of the engine and car was such that they would probably have passed over so much of the body as was lying between the rails without injuring it, and that the wheels ran over the legs of the deceased, is strongly confirmative of the truth of the defendant's statement that he struck Hoff down after taking him upon the track. The confession of the defendant, taken in connection with the proofs, *aliunde,* fully establishes the *corpus delicti.*

The next reason assigned for reversal is that the trial court committed error in its charge to the jury by making the following comment upon the failure of the defendant to testify in his own behalf: "In connection with the effect of the confession, and the facts which it states, I think it is proper for me to say to you that the defendant has heard this evidence which, in this confession, directly connects him with it (the murder), in which he admits he is responsible for it, and that it was done after he had formed the intention to kill this man, but has remained in his seat without attempting to deny or contradict the testimony of any of the state's witnesses. It may be that the circumstantial evidence in the case is not such as you would reasonably expect him to make any answer to, and no inference, of course, can be taken against a man keeping silent against things which cannot connect him with the crime in question, although they may have some possible bearing on it, but when it comes to his own confession of guilt produced here in open court, the fact that he has seen fit not to deny it in any way is a matter that you have a right to consider. Further than that, I will make no charge to you, but leave it to your own good judgment as to whether or not you will draw any inference from that fact." The rule is settled in this state that it is entirely proper for the trial judge to comment upon the conduct of the defendant in remaining silent when the evidence tends to establish facts which, if true, would be conclusive of his guilt, and he can disprove them, if untrue, by his own oath as a witness. *Parker* v. *State,* 32 *Vroom* 308; *S. C. on error,* 33 *Id.* 801. Counsel does not deny that the rule in this state

is as stated, nor does he attempt to overthrow it. His contention is that the defendant remained silent not because of any unwillingness on his part to testify, but because of a ruling of the court, made at the close of the state's case, which debarred him from offering himself as a witness; that for this reason his silence afforded no ground for inferring that he could not deny the making of the confession or the truth of the facts contained in it; and that, consequently, the rule established by Parker *v.* State was inapplicable, and the comment of the trial court unjustifiable.

The ruling of the court which it is said prevented the defendant from exercising the privilege of testifying in his own behalf was made on the application of defendant's counsel to dismiss the prosecution because of the failure of the state to make out a case which entitled it to go to the jury. Before making the motion, the following colloquy took place between counsel and the court:

"Counsel—I presume that it is your honor's understanding of the rule that we cannot move to dismiss this case at this stage of the proceeding, after the state has rested, without closing the entire case. Am I correct in that?

"The Court—You are.

"Counsel—So if we should elect now to move your honor to dismiss this proceeding, we will virtually close our case.

"The Court—Yes, you would have to close it in order to make that motion.

"Counsel—May it please the court, under your honor's ruling, which is the correct law, as I understand it, we have elected to close the case, and move to dismiss on the ground that the prosecution has not proved a *prima facie* case, beyond a reasonable doubt, and that, therefore, under the law, the defendant is under no obligation to answer this case."

Counsel then proceeded to argue the motion. Upon its refusal by the court no application was made to permit the defendant to interpose a defence on the merits, but the summing up to the jury immediately followed without objection. The question whether a prisoner is entitled, as a matter of right, to move for a dismissal at the close of the state's case,

without at the same time closing his own, is one which has never been directly decided by this court, although the expression contained in the opinion in *State* v. *Jaggers,* 42 *Vroom* 283, that "A motion to discharge the defendant or to direct a verdict of not guilty, at the close of the state's evidence, is addressed to the discretion of the court, and the action of the court is not reviewable on error," would seem to indicate that the making of the motion does not necessarily foreclose the defendant of his right to afterward put in his defense. The propriety of the ruling of the trial court, however, is not involved in the determination of the question presented by the assignment now being considered, for, whether right or wrong, its effect was to require the defendant either to refrain from making the motion at that time or to abandon his right to present evidence on his own behalf to the jury. Confronted with this situation, his counsel, acting, it must be presumed, with his full knowledge and approval, elected to forego his right to take the witness-stand in his own behalf, and moved to dismiss. Why, if the testimony of the defendant would have disproved the confession, or would have thrown reasonable doubt upon its truth, did he abandon the opportunity to destroy or weaken its effect? The inference is strong that his action was induced by the knowledge that the statements contained in the confession were true, and could not be successfully denied by him, and also by the hope that the ruling of the court would detract from the force which would otherwise be given to his failure to testify. His conduct in moving to dismiss, under the circumstances, entirely justified the comments of the court which he now complains of.

Another ground of reversal urged before us challenges the accuracy of the instruction to the jury as to the constituents of the crime of murder in the first degree. The instruction was that, to constitute that crime, "There must be, not only an intent to kill, but it must be willful, deliberate and premeditated. These last three words import that there must be an intent to take life. That is the general interpretation. The will must enter into it, and there must be an intent

formed in the mind prior to the act of killing. It is not necessary that that intent should be formed at any particular time; it need not be for a week, or a day, or for an hour, or for a minute even. Sometimes the human mind acts very quickly. If an intent to kill be formed an instant prior to the act of killing, it is sufficient to render it an intent, and to make it willful, deliberate and premeditated, within the terms of the statute. If there was an act of the mind, sufficient time for that, there need not be any particular time. It is sufficient if there has been a design to kill, which has been fully conceived, and purposely executed." The portion of the instruction which is claimed to be erroneous is that, "If an intent to kill be formed an instant prior to the act of killing, it is sufficient to render it an intent, and to make it willful, deliberate and premeditated, within the terms of the statute." Standing alone, this excerpt might readily convey the idea that an intent to take life so instantly carried into execution as to make it impossible that the homicidal act was either deliberate or premeditated, would nevertheless make the crime murder in the first degree. The cases in this court hold the contrary. *Donnelly* v. *State,* 2 *Dutcher* 463; *State* v. *Bonofiglio,* 38 *Vroom* 239; *State* v. *Zdanowicz,* 40 *Id.* 619. But, in determining upon the legal accuracy of a charge, it is not permitted to extract a single sentence and construe it without regard to the context in which it appears. The instruction is to be construed as a whole, and the legal rule, which was declared, thus extracted. Taking the whole charge upon this point, it does not seem to us to declare that a homicide, committed so immediately after the intent to take life has been formed as to exclude the possibility of deliberation or premeditation, is murder in the first degree; but that, on the contrary, the fair purport of the instruction, taken as a whole, is that, in order to constitute the crime of murder in the first degree, the design to kill must be fully conceived and purposely executed. But, assuming the instruction as a whole to be inaccurate, the error is a harmless one, and affords no ground for reversal. Whether an intent to kill, executed the

instant after its formation, makes the homicide murder in the first degree, was, in this case, purely an academic question. The evidence which, in the minds of the jury, proved the defendant's guilt beyond a reasonable doubt, settled with equal certainty the degree of his guilt, and the court would have been entirely justified in charging the jury that, if they found him guilty, they must, under the proofs in the case, convict him of murder in the first degree; for the same proofs which justified the verdict of guilty forced the conclusion that the defendant had formed the intent to kill two or three months before the commission of the crime, and that illicit love for his victim's wife was the motive which induced it. The error in the instruction as to what constituted murder in the first degree, if it was error, was, consequently, as innocuous as it would have been if the murder had been shown to have been committed in the perpetration of rape, robbery or arson.

The other causes of reversal which have been assigned by the defendant have each of them received consideration at our hands, but we do not find them of sufficient substance to merit discussion.

The judgment of the oyer and terminer must be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, FORT, PITNEY, SWAYZE, REED, TRENCHARD, BOGERT, VREDENBURGH, VROOM, GREEN, GRAY, DILL, JJ.   14.

*For reversal*—None.