465 A.2d 1256

**COMMONWEALTH of Pennsylvania**

v.

**Adolfo CARRILLO, Appellant.**

Superior Court of Pennsylvania.

Submitted April 28, 1983.

Filed Sept. 16, 1983.

Petition for Allowance of Appeal Denied Jan. 16, 1984.

116

Michael Alan Seidman, Philadelphia, for appellant.

Robert B. Lawler, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before ROWLEY, WIEAND and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the Order of the Court of Common Pleas of Philadelphia County denying appellant's, Adolfo Carrillo's Post-Conviction Hearing Act (PCHA) petition. 19 P.S. § 1180–1 *et seq., as amended; reenacted as* 42 Pa.C.S.A. §§ 9541–9551. We affirm.

The salient facts are as follows: In a non-jury trial before the Honorable Alex Bonavitacola, appellant was adjudged guilty of the shooting death of Santiago Garcia and possession of an instrument of crime. Boiler-plate post-trial motions that questioned the sufficiency of the evidence were filed by trial counsel. Subsequently, in his brief, counsel raised issues concerning the suppressibility of a confession and the commission of error on the part of the trial judge in allowing certain hearsay testimony into evidence. In response to the allegations proffered by appellant's counsel, the trial judge ruled only upon the sufficiency of the evidence and held all other issues waived, despite the submission of a brief to supplement the motions. It did so on the basis of *Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975).

On appeal, the same counsel who represented appellant throughout the criminal process raised, in addition to various matters categorized by the reviewing court as assailing the sufficiency of the evidence, three issues relating to the admissibility of an inculpatory statement, secured during an interrogation in which a police officer acted as the interpreter for the Spanish-speaking appellant.

Our Supreme Court sustained the trial court's ruling on all counts, including the waiver issue under *Blair*, and, thus, declined to decide the propriety of the circumstances under which the inculpatory statement was secured and its admissibility at trial. *Commonwealth v. Carrillo*, 483 Pa. 215, 395 A.2d 570 (1978) (Manderino, J., Dissenting).

On August 16, 1979, appellant filed a *pro se* PCHA petition claiming that, *inter alia,* prior counsel (David Weinstein) was incompetent because:

(a) Counsel Failed to protect Petitioner's Constitutionally secured Rights as set forth by the Constitution of the State of Pennsylvania.

(b) Counsel failed to preserve meritorous [sic] issues for Appellate Review.

(Appellant's *pro se* PCHA petition at 3)

The remaining errors alleged by the appellant concerned assertions that the Commonwealth encroached upon his right to appeal, its use of perjured testimony, inadmissible hearsay and an inculpatory statement in proving its case at trial. *Id.* Additionally, at appellant's request, (private) counsel was appointed and filed an amended PCHA petition, which represented in relevant part that:

\*    \*    \*    \*    \*    \*

9. Your petitioner is entitled and is eligible for relief in that:

\*    \*    \*    \*    \*    \*

(c) His convictions and sentence are as a result of the following:

(1) A confession was introduced at the trial of this case despite its being unlawfully and illegally secured from the petitioner in that he had never before been arrested and was unfamiliar with the criminal justice system. Further, he was born and raised in Puerto Rico and resided in Philadelphia, Pennsylvania for a short length of time and spoke absolutely no English and could not read or write English. Further, the interpreter used by the interrogating homicide detective at 8th and Ract [sic] Streets was an uneducated Philadelphia Policeman who was ineffective and was not a competent and professional interpreter and was neither learned nor an expert in interpreting. Further, professional, experienced and educated interpreters were readily available upon request of the Police Department. Further, considering the size of the Spanish community in Philadelphia, a professional, experienced and educated interpreter should be available at all times in situations analogous to the instant one. Con-

sequently, the confession obtained from your petition was done so in deregation [sic] of his due process and constitutional rights;

(2) Your petitioner did not knowingly and intelligently waive his right to a trial by jury;

(3) The "interpreter's" translation during the interrogation of petitioner to the interrogating detective who repeats same was hearsay;

(4) A mistrial should have been moved for by counsel and granted where the Assistant District Attorney accused petitioner of tampering with a witness and so informed the trial judge and a request was made for revocation of petitioner's bail; all of which prejudiced and biased the fact finder;

(5) The trial judge failed to comply with Rule 1123 of the Rules of Criminal Procedure; and

(6) *Your petitioner was represented at the pre-trial, trial and post-trial proceedings in this matter by ineffective counsel in that:*

(a) Said counsel failed to raise the specific issues that are stated above as well as others that occurred during all proceedings;

(b) Counsel neglected to effectively and competently advise petitioner as to what a waiver of a jury trial meant taking into account petitioner's background, intelligence, ethnic origin, lack of ability to communicate in an English speaking system and the nature of the charges; and

(c) Counsel failed to file specific issues in his post-verdict motions; inter alia, those as stated above as well as others that arose during the proceedings. This in spite of the law's requiring him to do so less his client be deemed to have waived them.

10. ...

11. Present counsel will present testimony from petitioner, trial counsel, etc.

12. ...

13. The matters alluded to above resulting in petitioner's conviction and sentence have neither been finally litigated nor waived.

(Record No. D–10)

Thereafter, appointed counsel submitted a supplemental PCHA petition amending paragraph (1), section (c) of Point 9, *supra,* to complain that the police interpreter "was not a neutral and impartial third party." (Record No. D–12)

Before the commencement of the PCHA hearing, presided over by the Honorable Edward J. Blake, an official court interpreter (Luisa Ramirez) employed by the Court of Common Pleas of Philadelphia County was sworn in to keep appellant apprised of what was occurring at the proceedings.[1]

The first witness to take the stand was Frank Rivera, an official interpreter (Spanish to English) for the court. He stated that in his 4½ years as an interpreter, he was aware of interpreters being present at the earliest stage of the judicial process, e.g., summary proceedings and preliminary hearings, up to and including the time set for sentencing. However, he had "never been asked" to be at an interrogation. (N.T. 2/23–24/81 at 9) He also opined that, based on his experience, if a person had a good knowledge of the Spanish and English languages there was no reason why such a person could not serve as an interpreter. He qualified the statement with the caveat that he "meant outside of Court." (N.T. 2/23–24/81 at 11) In the court, he felt, the person should have some knowledge of the legal terminology.

The next witness to testify was the 41-year-old appellant, and he did so through Ms. Ramirez. He stated he arrived in Philadelphia from Puerto Rico in 1967, returned to his homeland in 1973 and then came back here in 1975; yet he was unable to read, write or understand English. As for

1. These interpreters, while paid by the City of Philadelphia, are employees of the court. Their principal function is to serve the Court of Common Pleas and the Municipal Court of Philadelphia as interpreters.

Spanish, he remarked going "up to part or half of seventh grade" in Puerto Rico. (N.T. 2/23–24/81 at 15) Appellant also indicated that he had never been arrested, either in Puerto Rico or Philadelphia.

Recalling the events on the date of the shooting, appellant remembered being interviewed for about 4 hours at police headquarters by an Officer Ruiz (the interpreter), who was still in uniform, in the presence of a black detective. In the words of the appellant, he felt "physically ill and nervous and very fearful." (N.T. 2/23–24/81 at 17) On various occasions during the course of the interrogation, appellant revealed that he had difficulty communicating with Officer Ruiz, e.g., both individuals would have to "repeat" questions and answers so that the other could comprehend what was being said.

Prior to trial, appellant told of meeting with counsel for about an hour in his office in the company of appellant's niece's husband, who acted as interpreter. They discussed the repayment of the bail money and the signing of a paper pertaining to the waiver of a jury trial. For as appellant was made to understand by counsel, "it was easier or better for him [appellant's trial counsel] to convince one person as opposed to twelve[.]" (N.T. 2/23–24/81 at 29 & 30) No other aspect of a jury trial was discussed, as recalled by appellant, "in any way other than that" just recited. *Id.*

Appellant went on to testify, in essence, that despite the thoroughness of Judge Bonavitacola's colloquy, resulting in the waiver of his right to a trial by jury, the answers he gave were the product of "fear" and "nervousness". As appellant frames it, "I had no knowledge of what he [Judge Bonavitacola] was explaining because nobody had explained it to me." (N.T. 2/23–24/81 at 37) And, appellant said he did not "dare tell [the judge] about the jury because [his] lawyer had already told [him] not to take a jury." (N.T. 2/23–24/81 at 32–33)

Louis Rodriquez, appellant's niece's husband and interpreter at the meeting, corroborated appellant's version of what transpired in Attorney Weinstein's office. With this

testimony, and after the submission of two documents into evidence reflective of appellant's in-patient hospitalization (on March 22, 1976) and treatment by a physician (from April 20, 1976 to July 15, 1976), prior to and after the date of the homicide (on June 23, 1976), counsel for appellant rested.

The case for the Commonwealth consisted of the presentment of appellant's prior counsel, Attorney Weinstein.

What Attorney Weinstein testified to was at odds in various respects with appellant's recollection of what occurred between the two. For example, Attorney Weinstein, although not able to recall the exact number of times he met with appellant, did remember "meet[ing] with him on several occasions in [his] office and in the Courtroom." (N.T. 2/23–24/81 at 55) Appellant could only testify to having two meetings with counsel, one at the bail hearing and the other at counsel's office prior to trial.

Also, Weinstein's view of the discussion with appellant indicated a much more detailed conversation in which he advised appellant:

1) the absolute right to a trial by jury;
2) twelve people would be selected at random from society;
3) he could help in the selection process;
4) he could object to the selections made;
5) the jury would have to unanimously decide the case; and
6) based on the possible prejudiceness of the jury because of appellant's nationality and their belief that the killing was the outgrowth of a street fight, a judge would be more competent to render a decision.

However, counsel stated that the decision to waive a jury was ultimately appellant's, but it was his recommendation to do so. Counsel did not waver on cross-examination. After the completion of Weinstein's testimony, the hearing ended. Following this, the PCHA court entered an Order,

accompanied by an Opinion, denying appellant's request for relief. This appeal followed.

The questions presented to this Court, although not in the exact sequence that they appear in appellant's brief, are:

1.  Did the trial Court fail to comply with Rule 1123 of the Rules of criminal procedure?

2.  Did the defendant knowingly and intelligently waive his right to a jury trial?

3.  Was trial counsel ineffective because he filed "boiler-plate" post-verdict motions which resulted in specific trial issues being considered as waived by both the trial Court and the Supreme Court?

4.  Is the use of a Philadelphia police officer as an interpreter during a defendant's interrogation a denial of due process?

■ As for the Rule 1123 issue, we observe that although it was raised in the amended PCHA petition by counsel in paragraph (5), subsection (c) of Point 9 and in the appellate brief to this Court, *it was not pursued at the time of the PCHA hearing.* This fact is substantiated by PCHA counsel's own statement to the effect that "the issue in th[e] case" concerned the use of a police officer as the interpreter at appellant's interrogation, and as to whether appellant's "1123 rights were violated ... was another issue" that was never scrutinized at the hearing. (N.T. 2/23–24/81 at 18 & 25) Accordingly, we will not consider the question.[2] *Commonwealth v. Sullivan,* 472 Pa. 129, 371 A.2d 468 (1977).

The second issue raised by the appellant assails the validity of his waiver to a trial by jury.

We note, initially, that the jury trial waiver colloquy was conducted with the aid of an official court interpreter.

---

**2.** Even if we held there was no waiver, our review of the trial transcript reveals the judge advised appellant of: 1) his right to file post-trial motions; 2) the time frame within which they had to be filed; 3) the consequences of failing to file the motions; and 4) the right to the assistance of counsel, without cost to him, in the preparation of the motions. (N.T. 10/22/76 at 156–157) Thus, based on the aforesaid, the requirements of Pa.R.Crim.P. 1123 were satisfied.

Although appellant concedes that the requirements delineated in *Commonwealth v. Williams*, 454 Pa. 368, 312 A.2d 597 (1973) for a prima facie knowing and intelligent waiver of a jury trial were met (*see* N.T. 10/20/76 at 3–9; Appellant's Brief at 21), he argues that because he "did not speak or write English, was unfamiliar with the criminal justice system and was only answering the questions because his lawyer wanted a non-jury trial[, t]rial counsel effectively interfered with his ... right to have a jury trial and on this basis alone was ineffective." (Appellant's Brief at 21–22)

At the PCHA hearing, appellant testified that despite the answers he gave during the colloquy, which indicated his understanding of what was happening and the voluntariness of his actions, he, nonetheless, was feeling nervous, physically sick and fearful, all of "which didn't permit [him] to understand." (N.T. 2/23–24/81 at 33) Furthermore, he remarked that because Attorney Weinstein had already told him to waive a jury, he "didn't dare tell [the judge] about the jury ...." (N.T. 2/23–24/81 at 32)

The Commonwealth countered appellant's argument with Attorney Weinstein's testimony that there were various meetings between he and appellant at which all aspects of the case, including the pros and cons of a trial by jury, were discussed. Also, and most importantly, Attorney Weinstein persistently testified that, albeit the advise to go non-jury was his, the decision to do so was ultimately appellant's. (N.T. 2/23–24/81 at 57 & 59) According to Attorney Weinstein, appellant told him that "he would rely on [his] recommendation" to waive a jury. (N.T. 2/23–24/81 at 62)

■ The PCHA court, after hearing all the evidence, found as a fact that appellant waived his right to a jury trial knowingly and voluntarily, and, concluded as a matter of law that his waiver was valid. (PCHA court Opinion at 3) Such findings of fact, when supported by the record, are entitled to be upheld on appeal. *Commonwealth v. May*, 485 Pa. 371, 402 A.2d 1008 (1979). This is especially so on questions concerning the credibility of witnesses. *See Commonwealth v. Porta*, 297 Pa.Super. 298, 443 A.2d 845

(1982), petition for allowance of appeal denied September 1, 1982. Since it is not the function of an appellate court to engage in a *de novo* evaluation of the testimony elicited at a PCHA hearing, *id.,* we will not disturb the ruling made by the PCHA court here.

Moreover, on the waiver issue, we want to point out that after the appellant disclosed that he did not know anything about jury trials, because this was the first time he had been in court and he was taking pills prescribed for a nervous condition caused by a couple of operations he had undergone, the trial court took painstaking care to insure that appellant "understood" the ramifications of his waiver and his right to proceed to trial by jury *if he so wished. See Commonwealth v. Hooks,* 483 Pa. 40, 394 A.2d 528 (1978).

Throughout the colloquy appellant *repeatedly* answered in the affirmative when asked if he understood what was occurring in regard to the right that he was relinquishing and if he was responding truthfully to all of the questions. Appellant will not now be heard to say that his responses were *not* truthful. To do so would allow an accused to go through the motions at any waiver hearing and, subsequently, collaterally attack the validity of a colloquy giving rise to the waiver as involuntarily, unintelligently and unknowingly entered because of false responses given to the questions asked. As stated previously, the PCHA court's ruling on the propriety of the waiver issue is to be given deference by this Court when the facts support the ruling, especially on issues of credibility, even if the record could support a contrary holding. *See Commonwealth v. Lutz,* 492 Pa. 500, 424 A.2d 1302 (1981); *Commonwealth v. Ford,* 491 Pa. 586, 421 A.2d 1040 (1980); *see also Commonwealth v. Sweitzer,* 261 Pa.Super. 183, 395 A.2d 1376 (1978). We find no reason to reverse the PCHA court's determination concerning its findings of fact and conclusions of law on the voluntariness of the jury waiver.

The third issue raised by the appellant labels trial counsel ineffective for filing "boiler-plate" post-verdict motions that

caused all issues, save for the sufficiency of evidence question, to be held waived for purposes of review by both the trial court and our Supreme Court on appeal.

At first, appellate counsel states that the *only* way to rectify this misfeasance is to remand to allow his client the opportunity to file post-verdict motions *nunc pro tunc.* However, in the next breath, he requests that the issues be considered by this Court.

In light of the record created in this case, we are inclined to treat the issues presented in appellant's amended and original PCHA petition as equivalent to the filing of post-trial motions. *See Commonwealth v. Jones,* 300 Pa.Super. 338, 446 A.2d 644 (1982). We see no reason to remand. Appellant's position would seem to endorse such a treatment, for he importunes the Court to handle the claims raised. Having disposed of appellant's third prong, we can now turn our attention to the last, and most interesting, of appellant's complaints, that is, whether the use of a police officer as an interpreter, during interrogation, was a denial of his right to due process. In other words, appellant holds that "due process required that an interpreter who [was] both trained, experienced and impartial have been afforded [to him]." (Appellant's Brief at 10)

Ergo, trial counsel's failure to preserve the aforesaid issue for trial and/or appellate review, urges the appellant, warrants counsel being held less than effective. Before we can address the merits of appellant's averment, first, we need to determine whether the issue underlying the charge of ineffectiveness is of arguable merit. *Commonwealth v. Sherard,* 483 Pa. 183, 394 A.2d 971 (1978); *Commonwealth v. Jennings,* 285 Pa.Super. 295, 427 A.2d 231 (1981). Then, if the underlying issue is found to be of arguable merit, our inquiry shifts to a determination of whether the course chosen by counsel had some reasonable basis aimed at promoting his client's interests. *Commonwealth v. Evans,* 489 Pa. 85, 413 A.2d 1025 (1980); *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967).

We start by observing that, in regard to appellant's due process argument, it is an unassailable tenet of our constitutional system that the Government's power to punish citizens or aliens charged with violating the law may be exercised only in accordance with due process as prescribed by the Bill of Rights. *See Ex parte Milligan,* 71 U.S. (4 Wall.) 2, 119, 18 L.Ed. 281 (1866); *Rosado v. Civiletti,* 621 F.2d 1179, 1194 (2nd Cir.1980). Whether the constitutional guaranty of due process further proscribes the appointment of a police officer as an interpreter during the interrogation stage of the criminal process is a question never fully resolved in this jurisdiction. The most that has been stated is that the decision to use an interpreter (in a trial setting) rests in the sound discretion of the judge presiding over the case. *Commonwealth v. Pana,* 469 Pa. 43, 364 A.2d 895 (1976).

Nonetheless, it cannot be overlooked that the Legislature has taken specific steps to deal with this exact topic when it comes to the deaf. In 42 Pa.C.S.A. § 8701 the Legislature has provided:

### § 8701. Interpreters for the deaf

**(a) Interrogation.**—Upon the arrest of any deaf person, and prior to interrogation, the arresting officer shall make available to such person an interpreter who shall be present with such person throughout the interrogation.

**(b) Criminal proceedings.**—In any criminal proceeding in which a defendant is deaf the court shall appoint an interpreter to assist the defendant throughout the proceeding.

**(c) Oath.**—The interpreter shall swear or affirm that he will make a true interpretation to the deaf person and that he will repeat the statements of the deaf person to the best of his ability.

**(d) Definitions.**—As used in this section the following words shall have the meanings given to them in this subsection:

**"Deaf."** Persons who are deaf or whose hearing is so impaired that they are unable to understand or communicate the spoken English language.

**"Interpreter."** A person qualified and trained to translate for or communicate with deaf persons. Any person certified by the National or Local Registry of Interpreters for the Deaf or similar registry shall be considered qualified for the purposes of this section.

The requirement of an interpreter for the deaf has been extended to any proceeding before a Commonwealth agency. *See* 2 Pa.C.S.A. § 505.1 (Supp. 1964–1982). Also, the appointment or employment of an interpreter has been provided for in general or special court-martials or other military court inquiries. 51 Pa.C.S.A. § 5507. However, the Legislature has not seen fit to extend the use of an interpreter to criminal proceedings, specifically interrogations, where a suspect has difficulty speaking or understanding the English language. In light of the law covering the deaf, it is not presumptuous to say that the General Assembly has specifically eschewed the enactment of similar legislation in regard to non-English-speaking persons subject to interrogation. *See* 1 Pa.C.S.A. § 1921(c)(5) (Supp. 1964–1982).

The most that the Legislature has done, through the Judiciary Act Repealer Act (Act 1978, April 28, P.L. 202, No. 53, eff. June 27, 1978), is to consolidate the matters concerning the appointment of interpreters by the courts of common pleas (previously at 17 P.S. § 1875 and 28 P.S. § 441) under 42 Pa.C.S.A. § 2301 ("Appointment of personnel").[3]

---

**3.** Section 2301 provides:

**§ 2301. Appointment of Personnel**
(a) **General rule.**—Subject to any inconsistent general rules or statutory provisions each:
(1) Judge and district justice may appoint and fix the duties of necessary personal staff.
(2) Court may appoint and fix the compensation and duties of necessary administrative staff and fix the compensation of personal staff.

Having established the absence, at least in this Commonwealth, of either legislative or case law supportive of appellant's position, we find it instructive to examine the manner in which other jurisdictions (both state and federal) have dealt with the situation.

As is collected at Annotation: Disqualification, for Bias, of One Offered as Interpreter of Testimony, 6 A.L.R.4th 158, the author therein remarks:

> Numerous cases have contained language in one way or another lending support to the generality that it is at least better practice to appoint a disinterested person as interpreter .... However, a substantial number of cases have recognized that it is at least not necessarily reversible error to appoint a relative or friend of a witness or party to interpret, *especially where no other competent interpreter is available.*
>
>   \*   \*   \*   \*   \*   \*
>
> Cases throughout the annotation, frequently applying the broadly recognized principle that the appointment of an interpreter rests in the wise discretion of the trial court whose judgment may not be overturned unless abused, or finding an absence of prejudice in the circumstances, have held that *no reversible error was committed by trial courts who appointed as interpreters of non-English-speaking witnesses* (1) a friend or relative of

(3) Other agency or unit of the unified judicial system may appoint and fix the compensation and duties of necessary central staff and personal staff.

**(b) Oath of office.**—Each member of a judicial board or commission and each other person who is appointed to an office shall, before entering upon the duties of his office, take and subscribe the oath or affirmation specified in section 3151 (relating to oath of office).

**(c) County staff unaffected.**—The provisions of subsection (a) are intended solely to codify and consolidate former statutory provisions on the same subject and nothing in such subsection shall be construed to limit, modify or deny the existing powers or prerogatives of county staff or other officers, other than judges, elected by the electorate of a county, to appoint and to fix the reasonable compensation of such classes of personnel as such county officers have heretofore been authorized to do by law.

42 Pa.C.S.A. § 2301.

a witness or victim in a criminal case, ...; (2) ...; and (3) *a law enforcement officer or other governmental official to interpret for a prosecution witness in a criminal case, ....*

(Emphasis added)

*Id.* at § 2[a]. *Accord* Wharton's Criminal Evidence § 404 (13th Ed.1972).

We find that on the subject of impartial and unbiased interpreters the position consistently adhered to by most courts, although stated in different terms, is reflected in the statement made by the Tenth Circuit Court of Appeals:

> While in the nature of things, a disinterested interpreter is essential to an impartial interpretation of a witness' testimony, at the same time the trial court is necessarily accorded a wide discretion in determining the fitness of the person called, and the exercise of that discretion will not be disturbed on review in the absence of some evidence from which prejudice can be inferred. See *People v. Valencia,* 27 Cal.App. 407, 150 P. 68; *People v. Rardin,* 255 Ill. 9, 99 N.E. 59; *DeBaca v. Pueblo of Santo Domingo,* 10 N.M. 38, 60 P. 73; See annotation 172 A.L.R. 923, 941, Subsection (c).

*Lujan v. United States,* 209 F.2d 190, 192 (10th Cir.1953). *Accord United States v. Salsedo,* 607 F.2d 318, 320 (9th Cir.1979); *United States v. Carrion,* 488 F.2d 12, 14–15 (1st Cir.1973), *cert. denied,* 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974); *Chee v. United States,* 449 F.2d 747 (9th Cir.1971), disapproved on other grounds, *Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1973); *LaCount v. State,* 237 Ga. 181, 227 S.E.2d 31, 33 (1976), *cert. denied,* 429 U.S. 1046, 97 S.Ct. 753, 50 L.Ed.2d 761 (1977); *Commonwealth v. Pana, supra; People v. Torres,* 18 Ill.App.3d 921, 310 N.E.2d 780, 784 (1974); *State v. Coria,* 39 Or.App. 507, 592 P.2d 1057, 1059 (1979); *see also* Wharton's Criminal Evidence § 404 (13th Ed.1972) (citing cases); 6 A.L.R.4th 158.

Additionally, as is germane to the case at bar, it has been stated unequivocally that *"rulings on the appointment*

*and qualifications of interpreters do not reach constitutional proportions.* See *Fairbanks v. Cowan,* 6 Cir., 551 F.2d 97, 99. *Whatever problems there may be with the testimony of [an interpreter] go to the sufficiency of the evidence."* (Emphasis added) *Soap v. Carter,* 632 F.2d 872, 874–75 (10th Cir.1980), *cert. denied,* 451 U.S. 939, 101 S.Ct. 2021, 68 L.Ed.2d 327 (1981).

Therefore, because of the preceding and the safeguards already afforded an accused by our judicial system in the form of pre-trial, post-trial and appellate review, we refuse appellant's invitation to adopt a *per se* rule that there is an inherent bias, and a violation of due process rights, whenever a police officer is called upon to serve as a defendant's interpreter at an interrogation.[4] Rather, we are of the mind that a contention that an interpreter was biased, prejudiced or unfair toward the affected non-English-speaking defendant must be borne out by the record. *See Wainwright v. LaSalle,* 414 F.2d 1235 (5th Cir.1969); *Lujan v. United States, supra; LaCount v. State, supra; People v. Torres, supra; People v. Murphy,* 276 Ill. 304, 114 N.E. 609 (1916); *State v. Banusik,* 84 N.J.L. 640, 64 A. 994 (1906); *see also Chee v. United States, supra; State v. Coria, supra; but see Gonzales v. State,* 372 A.2d 191 (Del.Supr.1977); *People v. Gutierrez,* 137 Cal.App.3d 542, 187 Cal.Rptr. 130 (1982) (Staniforth, J., Concurring Opinion).

**4.** To embrace appellant's position would, of necessity, require that all police forces throughout the Commonwealth (regardless of size) have on their staff or on call an official, licensed interpreter for all non-English-speaking persons arrested and subject to interrogation. Such a requirement would be costly and, given the facts instantly, where an individual is arrested in the earlier morning hours, the police would have to await the arrival of the interpreter before interrogation could begin. This, in itself, might border on a violation of the 6-hour rule enunciated in *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977) regarding the suppressibility of inculpatory statements. *But see Commonwealth v. Keasley,* 501 Pa. 461, 462 A.2d 216 (1983) (arraignment of defendant twelve hours after arrest because arraignment judge not available not a violation of *Davenport* ).

We wish to note that we have only scratched the surface of the problem if such a requirement was implemented by judicial fiat. We believe it better to leave this matter to the Legislature to deal with, as they have done in the case of deaf persons. *See* 42 Pa.C.S.A. § 8701.

Thus, having ruled that a non-English-speaking defendant is not presumptively prejudiced by the assignment of a police officer to act as his interpreter, appellant has failed to satisfy the first prong (arguably meritorious claim) of the ineffectiveness test.[5]   *A fortiori*, counsel will not be

5. The requirement of whether record proof had been established to show that the appellant was prejudiced by the assignment has not been overlooked by this Court. We have reviewed the suppression court's findings against the standard of review set forth in *Commonwealth v. Johnson*, 467 Pa. 146, 354 A.2d 886 (1976), and see no reason to change its ruling.

All parties concede, as they must, that the sole issue at the hearing was whether the officer, assigned to act as interpreter, was capable of giving the appellant his *Miranda* warnings so that he could knowingly, voluntarily and intelligently exercise his right to waive them and, thus, render the inculpatory statement constitutionally valid. (Vol. III, RR. 3.6 & 3.25) In other words, because the officer testified that appellant was warned of all of his rights and the appellant testified to the contrary, it was a question of credibility—a matter which is peculiarly within the bailiwick of the trier of fact hearing the testimony.

The manner in which the 1:00 a.m. interrogation (which would have had an impact upon the availability of an official, licensed interpreter) was conducted by Detectives Johnson and Zucker consisted of, first, Johnson reading the *Miranda* warnings in English, one at a time, to the officer-interpreter. The officer-interpreter would, in turn, translate the warning into Spanish for the appellant. The appellant's Spanish response would, in like fashion, be translated into English by the officer-interpreter and told to Detective Johnson. Detective Johnson, and later on in the interrogation Detective Zucker, would type the answers as well as the questions given. Farther into the interrogation, appellant made a statement recounting how Santiago Garcia, over a span of some 5 hours, had used epithets and other abusive language directed at him in front of his family and relatives. In essence, the statement was an admission by the appellant that he had shot Santiago "two or three times" at a distance of about 20 feet and as the decedent was moving "backwards". At trial, appellant argued that he was acting in self defense when he shot Santiago.

We are not unaware of the difficulty that the suppression court and counsel for the Commonwealth were confronted with in seeking to have the officer-interpreter "read" in English "exactly" what was typed by the detectives regarding the questions asked and answers given at the interrogation. For example, there were mistakes in the translation of the officer-interpreter, as noted by the appellant's counsel, the official court interpreter present to aid the appellant and the court. However, "[o]ccasional errors in translation do not demonstrate that an interpreter is not qualified. [*United States v. Guerra*, 334 F.2d 138 (2nd Cir.1964), *cert. denied*, 379 U.S. 936, 85 S.Ct. 337, 13 L.Ed.2d 346 (1964).] Necessarily the trial judge has a measure of discretion in assessing qualifications to act as an interpreter. [*Fairbanks v. Cowan*,

deemed inept so as to warrant appellant the relief of a new trial.

Even assuming, *arguendo,* that it was error for the suppression court to hold that no impropriety occurred by the assignment of a police officer to act as appellant's interpreter at the interrogation, we conclude that it was harmless at best. *See Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *United States v. Felix-Jerez,* 667 F.2d 1297 (9th Cir.1982); *United States v. Cheung Kin Ping,* 555 F.2d 1069 (2nd Cir.1977); *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978).

At the bench trial, the Commonwealth presented the eyewitness accounting of the victim's two step-children, Angel and Richard Colon.

Angel, age 13, recounted how on the day in question he was playing in the house, with his brothers and friends, when his step-father came to the door. Someone let him in and when he asked for his little pistol lighter—a cigarette lighter in the shape of a pistol—Angel retrieved it from upstairs. After receiving the lighter, Santiago told him, "don't come after me. There's going to be some shooting." (Vol. I, N.T. 10/20/76 at 26) Nevertheless, Angel followed his step-father around the corner, a distance of about one-half block, to Norris and Marshall Streets. Once there, Angel stopped and stood by the firemen's station. He was able to see the appellant, with a gun in his hand, running out of a back door to a house on Norris Street. Angel then observed the appellant as he (Carrillo) "stood in the middle

551 F.2d 97 (6th Cir.1977).]" Louisell, David W. and Mueller, Christopher B., 3 Federal Evidence § 272 at 65. This is especially so since the appellant was entitled to cross-examine the officer-interpreter so as to test the correctness of the translation. V Wigmore on Evidence, § 1393 at 146 (Chadbourn rev. 1974) (the "interpreter may be required to repeat in the foreign language the words used by him ...."). We find that appellant's interests were adequately protected and it was for the suppression court to decide if the officer-interpreter was unqualified and thus tainted appellant's statement/confession.

Based on the testimony of the witnesses (which included the appellant) at the hearing, we are not persuaded to alter the suppression court's determination that the appellant's inculpatory remarks passed constitutional muster.

of the street and fired the first shot." (Vol. I, N.T. 10/20/76 at 30) Santiago was observed falling to the sidewalk. Appellant reacted, as recalled by Angel, by running up to Santiago and, at a distance of about 8 feet, firing two more shots at the victim as he laid on the sidewalk. (Vol. I, N.T. 10/20/76 at 31–32) After the shooting, Angel went to get the victim's brother and, thereafter, waited for the arrival of the police to tell them what had happened.

The second child, Richard, age 12, gave testimony consistent with that of his brother, Angel.

Officer Koch, the individual who transported Santiago to the hospital where he (Santiago) was pronounced dead on arrival, recalled seeing nothing in the victim's hand as the officer first observed him lying with head and shoulders on the sidewalk. The remaining portion of the body was lying in the street. It was not until the officer searched the body at the hospital that he found a lighter-type gun in the victim's right, front pants pocket. In fact, the Commonwealth's ballistics expert, Officer Carlin, identified the object as a cigarette lighter that "d[id] not even work as a cigarette lighter is supposed to work." (Vol. I, N.T. 10/20/76 at 94)

Halbert Fillinger, forensic pathologist and assistant medical examiner for the City and County of Philadelphia, testified that the victim sustained two bullet wounds, one above the left collar bone and the other behind the left ear. He also gave testimony that the victim's ethyl alcohol was .30.

In his own defense, appellant took the stand and recounted how on June 23, 1976 he and his wife traveled a distance of some 2 blocks to visit his sister-in-law, who was sick. He had been sitting in the yard in the company of family members for about half an hour when, at approximately 6:45 p.m., Santiago arrived and became verbally abusive, as he paced back and forth in the middle of the street. Initially, the remarks were aimed at the entire family, but then they were directed solely at the appellant. This alleged barrage of epithets continued for an hour to an hour-and-a-half, yet appellant did absolutely nothing. He "just stayed

there with [his] mouth open because [he] had never had any troubles with [Santiago] before." (Vol. II, N.T. 10/21/76 at 109) Appellant said Santiago seemed drunk, and, thus, his remarks did not make him angry; Carrillo "completely ignored him." (Vol. II, N.T. 10/20/76 at 110) Santiago left after about 1½ hours, but he returned, this time with beer and cigarettes, and took up where he left off from the middle of the street. This second session lasted for about an hour without appellant getting angry, despite the victim supposedly calling him "faggot" and "cuckold" (in Spanish the word is "cabron" and means somebody else's wife is running with another man, Vol. II, N.T. 10/21/76 at 67 & 112).

Thereafter, appellant says Santiago left but returned a third time. When he came back, appellant's version depicts the victim as having his hand hidden as he approached the accused. As he stood approximately 15 feet from the appellant, he came down off of the sidewalk and fell in the middle of the street, right in front of the accused. At this point, as told by the appellant, the victim lifted up his hand and aimed a gun at him. This caused everyone, except for the appellant, to run into the sister-in-law's house. Appellant took cover behind a truck parked in the street, "[a]nd that's when [he] shot to defend [him]self, because it was with the fear that [he] had that [he] had to do this." (Vol. II, N.T. 10/21/76 at 100) Appellant admitted to firing his weapon twice as the victim "was about 20 feet directly away from [him]." *Id.* The appellant testified that as he was getting behind the truck the victim "started to go backwards." (Vol. II, N.T. 10/21/76 at 121) Next, the appellant pointed out that as he fired the first shot, the victim "was going backwards." *Id.* Following the second shot, appellant threw the weapon underneath the truck, ran back into the house and helped his wife, who had asked to be taken upstairs. Appellant waited there until the police came.

Moreover, appellant did not deny making a statement to the authorities, and said it consisted of exactly what he had

just testified to having occurred. (Vol. II, N.T. 10/21/76 at 101)

On cross-examination, appellant testified that he purchased the .38 revolver 5 months before the incident from a vendor on the street and that he was carrying it in his sock on the day in question "only for [his] protection." (Vol. II, N.T. 10/21/76 at 105) This was, purportedly, only the second time that appellant had carried the weapon on his person. The remaining portion of appellant's defense consisted of testimony of relatives present at the scene during the time of the shooting, which tended to support appellant's version.

The trier of fact did not believe appellant's accounting and found him guilty as charged. On appeal, our Supreme Court likewise found sufficient evidence to support the judgment of sentence. *Commonwealth v. Carrillo, supra.*

Based on the aforesaid, we cannot say that the admission of the Carrillo statement was so prejudicial that the only recourse is to grant appellant a new trial, minus the presentment of the statement into evidence by the prosecution. We find that, even if we were to dismiss the content of the statement, the evidence (eyewitness accounts and the appellant's own damaging testimony) is otherwise supportive of the verdict. Stated differently, this Court determines that there is no "reasonable possibility" that the error, conceding for the sake of argument that one occurred, could have contributed to the verdict. *Commonwealth v. Story, supra.*

Finding the claims of the appellant to be meritless, we affirm the Order of the PCHA court.

WIEAND, J., files a concurring statement which is joined by ROWLEY, J.

WIEAND, Judge, concurring:

I join all but the final portion of the majority's opinion. I agree that appellant's constitutional rights were not violated because his inculpatory statement, given in Spanish, was

translated into English by a police officer. I agree also that a contrary argument would have lacked merit and that counsel, therefore, was not ineffective for failing to preserve the issue in post trial motions. Because of this conclusion, I find it unnecessary to consider whether the Commonwealth's use of the statement at trial, if error, would have been harmless.