546 A.2d 1185

**COMMONWEALTH of Pennsylvania**

v.

**Ronald M. CARELLI, Appellant.**

Superior Court of Pennsylvania.

Submitted June 22, 1987.

Filed Aug. 15, 1988.

118

120

William R. Miller, Washington, for appellant.

John C. Petit, District Attorney, Washington, for Com., appellee.

Before BROSKY, KELLY and WATKINS, JJ.

KELLY, Judge:

Appellant, Ronald M. Carelli, appeals from an order denying his petition for post-conviction relief under the Post Conviction Hearing Act (PCHA), 42 Pa.C.S.A. § 9541 *et seq.* Appellant contends that prior counsel was ineffective in failing to seek suppression of all the evidence against him based upon an alleged illegal search and in failing to challenge the admissibility of certain statements alleged to be hearsay. We find no merit in the contentions, and accordingly affirm the order denying post-conviction relief.

## FACTS AND PROCEDURAL HISTORY

At 8:30 p.m. on March 2, 1984, Mr. Gerald Shriver reported that his recently purchased, used Ford pickup truck had been stolen from the Washington County Mall sometime between 8:00 p.m. and 8:20 p.m. on March 2, 1984. Mr. Shriver gave a description to the police indicating that the stolen vehicle was a 1979 blue Ford, 150F, four wheel drive pickup with a white cap, fog lights, and a blue bug visor on the front. (N.T. 6/14/84 at 19, 23–24).

At approximately 10:15 p.m. a report was transmitted to Officer Dean Casciola from the police control center that an anonymous caller reported following the stolen truck from the Washington Mall to a garage located at a residence in Hickory, Pennsylvania approximately one half hour (driving) from the Washington Mall. (N.T. 6/14/84 at 30; *see also* Affidavit of Probable Cause attached to the March 19, 1984 Arrest Warrant). Officer Casciola went to the address indicated to investigate; he discovered appellant in the garage with the stolen truck. Appellant was arrested and charged with theft, conspiracy and receiving stolen property.

Appellant was tried, on June 14, 1984, before the Honorable Thomas D. Gladden, President Judge of the Washington County Court of Common Pleas, and a jury on a charge of receiving stolen property. At trial, appellant acknowledged that the stolen truck was in his garage and that he was in the garage when it was discovered by the police. His

defense was that he had been helping his brother and sister-in-law move all day, he had returned home to get some tools from the garage only minutes before the police arrived, and, he had no idea that the truck in his garage had been stolen. He explained further that he often let others use his garage to work on their cars and when he arrived home on the evening in question his wife told him that his friend, Mr. Frank Mullaney, had left a vehicle in the garage and indicated that he would be back for it the next day. (N.T. 6/14/84 at 52–71). Significantly, appellant testified (contrary to Officer Casciola's testimony) that he had left the garage door open approximately two feet when he entered the garage and when he came out to speak to the police officer, the officer was able to see almost the whole truck. (N.T. 6/14/84 at 64, 69). The clear import of appellant's testimony was that he had nothing to hide and that he made no attempt to do so.

Appellant presented corroborative testimony from Mr. James Allen and his sister-in-law, Mrs. Kathleen Carelli. Mr. Allen testified that appellant permitted him, and others including Mr. Mullaney, to use appellant's tools and to work on their vehicles in appellant's garage. (N.T. 6/14/84 at 41–44). Mrs. Carelli testified that appellant had been helping her and appellant's brother Larry move and that appellant left at about 9:30 p.m. to go to his garage for some tools so that he could reassemble some beds. (N.T. 6/14/84 at 47–48). Appellant's wife did not testify at trial. Mr. Mullaney's whereabouts were alleged to be unknown. (N.T. 6/14/84 at 46, 66–68).

The jury found appellant guilty of receiving stolen property. In post-verdict motions, appellant contended: the evidence was insufficient to sustain the verdict; the prosecution improperly and prejudicially stated that appellant was operating a "chop shop;" and two jurors were unduly influenced by the jury foreman. Post-verdict motions were denied. Appellant was sentenced to a term of imprisonment in a county facility of ten to twenty months; this court affirmed judgment of sentence by Per Curiam Order

and Memorandum. *See Commonwealth v. Carelli*, 353 Pa.Super. 642, 506 A.2d 1334 (1985) (Per Curiam; Brosky, and Watkins, JJ., join; Cavanaugh, J., concurring).

Subsequently, appellant filed a *pro se* PCHA petition, and an amended *pro se* PCHA petition. Counsel was appointed for appellant and an amended counselled PCHA petition was filed. The counselled PCHA petition was later amended.

On October 8, 1986, a motion to set a date for an evidentiary hearing was filed on behalf of appellant; on that same date, the trial court entered an order scheduling an evidentiary hearing on the petitions for December 10, 1986. However, on December 10, 1986, appellant through counsel declined to present any evidence in support of the petition, electing instead to submit his case to the trial court based upon the record (which was stipulated to by the parties) and the arguments in the briefs submitted by the parties. The court noted on the record its receipt of appellant's brief and directed the Commonwealth to file a response brief within ten days. The court also indicated its intent to review the briefs, the record, and the applicable law, and then to render a decision. (N.T. 12/10/86 at 1–2). On January 6, 1987, the trial court entered the following order:

> AND NOW, this 6 day of January, 1987, upon consideration of the record, the Briefs and Arguments of counsel we find that defendant was at all times represented by competent counsel during the pre-trial and trial stages of this litigation. The search by Officer Casciola was made in plain view and the failure to make objections to alleged hearsay statements is without merit as it relates to competency of counsel. Defendant's petition for Post Conviction Relief is denied.

Timely notice of appeal was filed, and this case is now properly before this Court for disposition.

I.

Initially, we note that in PCHA proceedings, the trial court sits as finder of fact. It is, therefore, the province of

the trial court as finder of fact to weigh the credibility of the witnesses and to resolve all conflicts in the evidence; it is the prerogative of a finder of fact to believe all, part, or none of the evidence presented. *See Commonwealth v. Dickerson*, 449 Pa. 70, 73–74, 295 A.2d 282, 284 (1972); *Commonwealth v. Johnson*, 355 Pa.Super. 123, 131–32, 512 A.2d 1242, 1246 (1986). On review, we are bound by findings of fact which have support in the record, but not by the trial court's conclusions of law. *See Commonwealth v. Carrillo*, 319 Pa.Super. 115, 124–25, 465 A.2d 1256, 1261 (1983); *citing Commonwealth v. May*, 485 Pa. 371, 402 A.2d 1008 (1979); *cf. Commonwealth v. White*, 358 Pa.Super. 120, 123, 516 A.2d 1211, 1212–13 (1986) (review of findings of a suppression hearing).

Although appellant was granted an evidentiary hearing, he declined to present any witnesses, electing instead to submit the case to the trial court on the basis of the record and the briefs. Appellant contended, essentially, that prior counsel had been ineffective *as a matter of law*. Our review of some, but not all, of the claims raised in this case is substantially hindered by the failure of the trial court to comply with the dictate of Pa.R.Crim.P. 1506(5) which provides:

When a court grants a post-conviction hearing, it shall:
(5) Cause all evidence adduced at the hearing to be recorded, *file a statement of record setting forth its findings of fact and conclusions of law;....*

(Emphasis added). The order of January 6, 1987, contains conclusions of law but no findings of fact. Consequently, an order directing the trial court to file an opinion or memorandum setting forth the findings of fact upon which the January 6, 1987 order is based would ordinarily be appropriate. *See Commonwealth v. Rohde*, 485 Pa. 404, 402 A.2d 1025 (1979); *Commonwealth v. Elliott*, 319 Pa.Super. 521, 466 A.2d 666 (1983). It is not for this Court to review the record and substitute its assessment of the weight of the evidence and the credibility of the witnesses for that of the finder of fact below. A reviewing court is

bound to honor the right *and obligation* of the finder of fact to believe all, part, or none of the evidence presented; and, is likewise constrained from speculating upon matters not in evidence. *See Commonwealth v. Griscavage*, 512 Pa. 540, 546, 517 A.2d 1256, 1259 (1986). However, for the reasons which follow we find remand unnecessary in the instant case.

## II.

In order to prevail upon a claim of ineffective assistance of counsel, appellant has the burden to establish: 1) by act or omission counsel was arguably ineffective; 2) the act or omission challenged could not have had an objectively reasonable basis designed to effectuate appellant's interest; and 3) appellant was prejudiced by the act or omission in that but for the challenged act or omission there is a reasonable probability that the result of the trial would have been more favorable to appellant. *See Commonwealth v. Petras*, 368 Pa.Super. 372, 374–78, 534 A.2d 483, 484–85 (1987) (collecting cases). If an appellant makes a sufficiently specific *proffer* to establish an *arguable* claim of ineffective assistance of counsel, then such an appellant will be entitled to an evidentiary hearing in which appellant will have the opportunity to support its claims and the Commonwealth will have the opportunity to rebut the claims. *Id.* At such a hearing, however, the burden remains upon appellant to translate *arguable claims* into *actual proof* of ineffective assistance of counsel. *Id.*

When, as in this case, an assertion of ineffective assistance of counsel is based upon the failure to pursue a suppression motion, proof of the merit of the underlying suppression claim is necessary to establish the merit of the ineffective assistance of counsel claim. *Kitrell v. Dakota*, 373 Pa.Super. 66, 74–75, 540 A.2d 301, 305 (1988), *citing Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). In *Kimmelman*, the United States Supreme Court, per Justice Brennan, explained:

The essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial

balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect. *See e.g., Strickland v. Washington,* 466 US 668, 80 L Ed 2d 674, 104 S Ct 2052; *United States v. Cronic,* 466 US 648, 655–657, 80 L Ed 2d 657, 104 S Ct 2039 [2044–2046], (1984). In order to prevail, the defendant must show both that counsel's representation fell below an objective standard of reasonableness, *Strickland,* 466 US, at 688, 80 L Ed 2d 674, 104 S Ct 2052 [at 2065], and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.,* at 694, 80 L Ed 2d 674, 104 S Ct 2052 [at 2068]. *Where defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice.* Thus, while respondent's defaulted Fourth Amendment claim is one element of proof of his Sixth Amendment claim, the two claims have separate identities and reflect different constitutional values.

477 U.S. at 374–75, 106 S.Ct. at 2583, 91 L.Ed.2d at 318–19. (Emphasis added). *Cf. Commonwealth v. Kay,* 330 Pa.Super. 89, 95, 478 A.2d 1366, 1369 (1984) (ineffectiveness claim based on failure to pursue suppression motion was without merit because the underlying suppression claim was without merit; counsel's failure to pursue the meritless claim was deemed reasonable).

Thus, while presentation of an *arguable* omitted suppression claim may have entitled appellant to an evidentiary hearing, appellant was not entitled to relief unless he established at the evidentiary hearing that: his suppression claim would have prevailed at a suppression hearing; there was no objectively reasonable basis designed to effectuate appellant's interests for counsel's failure to pursue a suppression motion; and, there was a reasonable probability that, if the

evidence had been suppressed, the result of the trial would have been more favorable to appellant.

Appellant contends that trial counsel was ineffective in failing to seek suppression of all evidence derived as the result of Officer Casciola's allegedly unconstitutional search of appellee's garage. Despite the absence of findings of fact resolving certain conflicts in the evidence, we find that there is no merit in appellant's underlying suppression claim. Moreover, an objectively reasonable tactical basis for *not* pursuing the suppression claim appears on the face of the record. Accordingly, we find no merit in appellant's first ineffective assistance of counsel claim. Appellant's second and third ineffectiveness claims lack underlying merit; moreover, there is no reasonable probability that had the challenged evidence been excluded the result of the trial would have been more favorable to appellee. Consequently, we affirm the order denying post-conviction relief.

### III.

Appellant argues that the constitutional prohibition against unreasonable searches and seizures is violated when a police officer investigating an anonymous tip that a stolen truck was located in a garage on a particular residential property: proceeds to the address; enters the property; knocks on the front door of the house located on the property; speaks to the wife; asks to speak to the husband; is informed that the husband is in the garage; follows the wife to the garage; and, while standing outside the garage looks over the husband's shoulder through the open garage door and sees the stolen truck. Appellant argues that the visual observation of the interior of the garage was a search of a protected area and that the plain view exception could not apply because: 1) the interior of the garage could not be seen by a passerby; and 2) the view was not inadvertent because the anonymous tip provided Officer Casciola with probable cause for a search and Officer Casciola knew that the evidence he sought was in the garage. We cannot agree.

## A.

We note, initially, that the record does in fact contain evidence that: Officer Casciola was able to see the stolen truck inside the garage by looking over appellant's shoulder as appellant opened, then quickly closed, the garage door (N.T. 6/14/84 at 32) (testimony of Officer Casciola); the only way into the garage was through a sliding garage door (N.T. 6/14/84 at 54); the garage windows were boarded up (N.T. 6/14/84 at 64); and, the property in question was zoned residential, was leased to appellant, and contained a small ranch house and a two to three car garage "adjacent" to the house. (N.T. 6/14/84 at 30, 36, 38, 42, and 53). From these isolated excerpts of the record, the dissent finds that the garage was part of the protected curtilage of appellant's residence, and further finds that appellant took security measures and exposed the interior of his garage only when it became unavoidable to shield it from view, *i.e.* upon opening the garage in order to exit and respond to police questioning. The dissent concludes that these "facts" establish an unreasonable search.

While the transcript excerpts above could certainly support inferences that the garage was within the curtilage and that appellant took security measures to protect the privacy of the interior of the garage, we find those isolated excerpts to be inconclusive and misleading in material respects. We note that the following excerpt from appellant's testimony clearly contradicts the testimony of Officer Casciola relied upon by the dissent:

Q. Your garage has windows, is that correct?

A. But they're boarded up.

Q. *And the garage door was open?*

A. *About two foot.*

Q. *And you opened it whenever you greeted him?*

A. *Chief Casciola, no. When I went in I opened them up and turned the lights on and walked over to my box and got my stuff* and I was right where I was getting my stuff and my wife said, 'Ron, there is a

police officer out there who would like to see you.' And I said, 'Alright, I'll be right out.'

Q. How long did you talk to him?

A. About three minutes, I guess, about that. He just shook my hand and he said there was a disturbance of noise and he was standing there and he shook my hand and he said there had been a disturbance of noise [sic] and I said, 'It couldn't be me, I just got here.'

(N.T. 6/14/84 at 64) (testimony of appellant). (Emphasis added). We also note appellant's testimony that: *he left the garage doors open about two feet when he went in to get his tools* (N.T. 6/14/84 at 55, 64); while he was in the garage his wife called in and told him a police officer wanted to talk to him (N.T. 6/14/84 at 57–58, 64, 69); *he did not have to move the garage doors to exit the garage* (N.T. 6/14/84 at 55); he spoke with Officer Casciola for about three minutes (N.T. 6/14/84 at 64); and, *Officer Casciola "saw almost like the whole truck...."* (N.T. 6/14/84 at 69). Officer Casciola's assertion that appellant opened and then quickly closed the door behind him is explicitly contradicted by appellant's testimony.

Appellant contended, essentially, that he had no reason to think the truck was stolen *and made no attempt to hide it from Officer Casciola's view.* Thus, the record contains *conflicting evidence* as to whether appellant in fact took security measures to preserve the privacy of the interior of the garage. It was for the fact finder, not this Court, to resolve that conflict.[1]

1. The dissent suggests that appellant's testimony, which clearly supports inferences in favor of the Commonwealth on the Fourth Amendment claim, must be ignored because it is directly contradicted by the testimony of Officer Casciola, a Commonwealth witness. As the dissent notes, it is commonly stated that "in determining whether the findings of fact are supported by the record, we are to consider only the evidence of the appellee and so much of the appellant which, as read in the context of the record as a whole, remains uncontradicted." *See e.g. Commonwealth v. White,* 358 Pa.Super. 120, 123, 516 A.2d 1211 (1986), *citing Commonwealth v. Hamlin,* 503 Pa. 210, 215–16, 469 A.2d 137, 139 (1983).

Moreover, the record is inconclusive as to whether the garage was within the curtilage of the house. From this record it is unclear how far the house was from the garage, or how far the garage was from the road. Similarly, the record is silent as to where Officer Casciola stood in relation to the road, the drive, the garage and the house. We are unable, therefore, to determine from the present record whether Officer Casciola was standing inside or outside the curtilage when he looked into appellant's garage. Although there is evidence of record indicating that the lot was zoned residential, there is no indication of the size of the lot. The characterization of the garage as "adjacent" to the house only vaguely indicates proximity to the house.[2] While the fact finder could have inferred from the present record that Officer Casciola and the garage were located within the curtilage, we do not believe it is appropriate for this Court

However, it is axiomatic that a finder of fact is free to believe all, part or none of each witness' testimony. *Commonwealth v. Arms*, 489 Pa. 35, 39, 413 A.2d 684, 686 (1980). Thus, the PCHA court, acting as finder of fact in this case, could have credited appellant's testimony over Officer Casciola's on this one issue, yet still have rejected the remainder of appellant's testimony. Accordingly, in a case such as this, the standard for determining whether a finding is supported by the record would be more appropriately expressed as follows—in determining whether the findings of fact are supported by the record, we are to consider all the evidence of record which supports the finding, *from whatever source,* and only such evidence of record which negates the finding which, as taken in the context of the record as a whole, remains uncontradicted. Moreover, with respect to "uncontradicted" evidence, due regard would have to be given to the fact that a trial court may simply reject evidence offered as "not credible," even where *direct* contradiction is not present.

To suggest that the general *dictum* must be applied on appeal so as to require consideration of evidence which negates a finding, and rejection of other evidence which supports a finding *based upon which party offered the evidence,* is to ignore the right of the fact finder to find that a witness' testimony contains some truth and some fiction; this we find contrary to law and common sense. Consequently, we reject the dissent's overliteral construction of the general *dictum* stated above.

2. *See Webster's Ninth New Collegiate Dictionary,* at 56 (1986) (distinguishing "adjacent," "adjoining," "contiguous," and "juxtaposed"). The fact that "adjacent" may imply the absence of similar structures between the house and the garage does not resolve the uncertainties indicated above.

to draw such inferences for itself on appeal, especially when, as here, the inference drawn goes against the party who prevailed in the court below. If these factual issues were dispositive of the instant appeal, we would be compelled to remand.

### B.

As indicated above, we find that the stipulated record contains sparce, vague, and contradictory evidence as to the precise circumstances of Officer Casciola's view of the interior of appellant's garage. Despite the lingering uncertainties, however, we find that the present record nonetheless establishes the absence of an unconstitutional search.

### 1.

The officer's view of the interior of appellant's garage could only be found to violate appellant's Fourth Amendment rights if appellant exhibited an actual expectation of privacy which society is willing to accept as objectively reasonable under the circumstances. *See California v. Greenwood,* —— U.S. ——, ——, 108 S.Ct. 1625, 1628, 100 L.Ed.2d 30, 35 (1988) (citing cases). While it is axiomatic that the Fourth Amendment protects people, not places (*Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967)), the determination of whether an actual and objectively reasonable expectation of privacy existed requires some reference to place. *Id.,* 389 U.S. at 361, 88 S.Ct. at 516 (Harlan, J., concurring).

Generally, a subjective expectation of privacy as to that which is located in an area of common access will be deemed to be unreasonable; and therefore, visual observation of evidence located in open view in an unprotected area does not constitute a search so as to trigger Fourth Amendment protections. *See United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987) (no search occurred when police standing outside the curtilage of a house looked into a barn which was also located outside the curtilage of the house); *Commonwealth v. Chiesa,* 329

Pa.Super. 401, 406–07, 478 A.2d 850, 853 (1984) (no search when police officer shined flashlight and looked into car which was parked unattended in a driveway shared with visitors and fellow tenants); *see also* I *LaFave, Search and Seizure,* § 2.2(a) at 322–23 (2nd Ed.1987); Moylan, *The Plain View Doctrine,* 26 Mercer L.Rev. 1047, 1097–98 (1975).

Likewise, mere observation of evidence located in a protected area, from a lawful vantage point outside the protected area, is generally deemed not to be a search. *See United States v. Dunn, supra; California v. Ciraolo,* 476 U.S. 207, 211–15, 106 S.Ct. 1809, 1812–13, 90 L.Ed.2d 210, 216–17 (1986) (aerial observation of evidence located within the curtilage of a home from a vantage point within the public airspace was not a search); *Commonwealth v. Milyak,* 508 Pa. 2, 6, 493 A.2d 1346, 1348–49 (1985) (*dicta*); *Commonwealth v. Weik,* 360 Pa.Super. 560, 563–65, 521 A.2d 44, 46–47 (1987) (*dicta*); *Commonwealth v. Busfield,* 242 Pa.Super. 194, 198–99, 363 A.2d 1227, 1228–29 (1976) (observations of evidence inside a residence, viewed from adjacent property through a sheer curtain was not a search); *Commonwealth v. Hernley,* 216 Pa.Super. 177, 263 A.2d 904 (1970), *cert. denied* 401 U.S. 914, 91 S.Ct. 886, 27 L.Ed.2d 813 (1971) (observation of evidence inside print shop, viewed with binoculars from ladder on adjacent property through an open second floor window was not a search).[3]

As noted above, absent mechanical assistance, the mere observation of evidence from a lawful vantage point is generally deemed not to invade a reasonable expectation of

---

**3.** However, some *mechanically aided* observations have been deemed to be unreasonable intrusions despite the fact that the observer was located at a vantage point outside the protected area. *See Commonwealth v. Williams,* 494 Pa. 496, 500, 431 A.2d 964, 966 (1981) (use of "startron" by police to conduct extended nighttime surveillance through uncurtained third floor apartment window was unreasonable where surveillance involved observation of intimate acts of persons who were not properly a focus of the surveillance; *but, observations with naked eye and ordinary binoculars were not unreasonable*); *see also* Nicholson, *Mechanically Aided Observations Under the Fourth Amendment,* 11 Search and Seizure L.R. 1, 1–7 (1984).

privacy and therefore not to constitute a search. Because there is no search, there is no need for an *exception* to permit admission of testimony relating to the observation. Hence, such cases may properly be distinguished as relying on an open view or plain view *doctrine,* rather than the plain view *exception* as formulated in *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L.Ed.2d 564, 91 S.Ct. 2022 (1971) (plurality) *reh. den.* 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971), and refined in its progeny. *See* I *LaFave, Search and Seizure* § 2.2(a) at 320–23; Moylan, *supra,* at 1097–98; Note, *"Plain View," Anything But Plain,* 7 Loyola L.R. 489, 489 n. 3 (1974).

The plain view *exception* is ordinarily applicable where there has been a physical intrusion into a protected area prior to the observation of the evidence, or where physical intrusion for a search or seizure follows an initial (non-search) observation from outside a protected area. The orthodox statement of the plain view exception is, that before the police may conduct a warrantless search or seizure of evidence in plain view: the police must be lawfully present at the vantage point from which the evidence is discovered; the discovery of the evidence must be inadvertent; and, the probable evidentiary value of the evidence must be immediately apparent.[4]

### 2.

The uncertainties which remain unresolved in the instant case as to where the garage and Officer Casciola were located in relation to the curtilage of appellant's house cloud our inquiry as to whether the plain view *doctrine* or

4. *See generally* I *LaFave, Search and Seizure* § 2.2 at 320–350; Hall, *Search and Seizure,* §§ 3.9–3.16 at 62–71 (1982 & 1987 Cumm. Supp.); Annotation, *Validity of Seizure Under Fourth Amendment "Plain View" Doctrine—Supreme Court Cases,* 75 L.Ed.2d 1018 (1985 & 1987 Supp.), *superceding* 29 L.Ed.2d 1067 (1972), 14–31 *L.Ed.2d Later Case Service* 451 (1983); Note, *Recent Cases—Justification of a Warrantless Seizure Under the Plain View Doctrine,* 88 Dickinson L.Rev. 549, 549–64 (1984); Cintron, *The Plain View Exception to the Fourth Amendment,* 10 Search and Seizure L.Rep. 173, 173–80 (1980); Moylan, *supra*; Note, *"Plain View"—Anything But Plain,* 7 Loyola L.Rev. 489 (1974); LaFave, *Warrantless Searches and the Supreme Court,* 8 Crim.L.Bull. 9, 9–30 (1972).

the plain view *exception* apply. If either Officer Casciola or the garage were physically located outside the curtilage of appellant's house, then we would find that Officer Casciola's brief unassisted observations of the stolen truck inside the garage fell within the plain view *doctrine*, no search occurred, and that our inquiry was at an end. Nonetheless, we will assume for the purpose of discussion (as the dissent finds) that both Officer Casciola and the garage were located within the curtilage of appellant's house at the time of Officer Casciola's observation of the stolen truck inside appellant's garage, and that, technically speaking, Officer Casciola was trespassing.

Undeniably, one of the primary sources of a reasonable expectation of privacy is the right to exclude trespassers which attaches to property rights. *Cf. Commonwealth v. Lemanski*, 365 Pa.Super. 332, 346, 529 A.2d 1085, 1091 (1987), *citing Rakas v. Illinois*, 439 U.S. 128, 142 n. 12, 99 S.Ct. 421, 430 n. 12, 58 L.Ed.2d 387, 401 n. 12 (1978). However, the right to exclude trespassers and the existence of an objectively reasonable expectation of privacy are not co-extensive. For example, observations made by a person *trespassing* in an open field are not deemed to invade the property owner's reasonable expectations of privacy. *See* Annotation, *Supreme Court's Development of "Open Fields Doctrine" with Respect to Fourth Amendment Search and Seizure Protections*, 80 L.Ed.2d 860 (1986 & 1987 Supp.).

While the curtilage area surrounding a house is, of course, a protected area which lies outside the ambit of the open fields doctrine, *Commonwealth v. Cihylik*, 337 Pa.Super. 221, 230–31, 486 A.2d 987, 992 (1985), this Court has held in several cases that evidence was reasonably and therefore constitutionally acquired despite the fact that the investigating officer was technically trespassing upon the curtilage of the property when the evidence was discovered. *See Commonwealth v. McKeirnan*, 337 Pa.Super. 403, 487 A.2d 7 (1985) (police officer's trespass on private land was reasonable in order to investigate possible shooting and to

speak with particular person thought to be present at the property and the evidence obtained while trespassing was therefore admissible, collecting cases); *Commonwealth v. Shannon*, 320 Pa.Super. 552, 467 A.2d 850 (1983) (police officer's entry into curtilage area was reasonable in response to a "fight in progress" radio report, the evidence obtained while trespassing was admissible); *Commonwealth v. Daniels*, 280 Pa.Super. 278, 421 A.2d 721 (1980) (police officer's approach to apartment, then "consensual" entry into apartment was reasonable in response to anonymous tip of an abduction in progress, the evidence obtained while trespassing was admissible); *Commonwealth v. Cubler*, 236 Pa.Super. 614, 346 A.2d 814 (1975) (police officer's entry into curtilage area was reasonable to retrieve black bag suspiciously discarded or hidden by suspect in a doghouse, the evidence obtained while trespassing was admissible); *accord People v. Houze*, 425 Mich. 82, 92 & n. 1, 387 N.W.2d 807, 811 & n. 1 (1986) (police officer's entry into curtilage area to look into a garage through a window was reasonable to investigate anonymous tip concerning a stolen car, collecting cases); *Pistro v. State*, 590 P.2d 884, 886–87 (Alaska 1979) (police officer investigating an anonymous tip that a stolen truck was in a particular garage, who could not see into garage from street, reasonably walked up the driveway to look into the garage, and, therefore, was lawfully in a position to see the stolen truck in the garage when the garage door was opened).[5]  Indeed, "the presence or

5.  In *People v. Houze, supra,* Justice Cavanaugh of the Michigan Supreme Court noted:

It is not objectionable for an officer to come upon that part of the property which 'has been opened to public common use.'  The route which any visitor to a residence would use is not private in the Fourth Amendment sense, and thus if police take the route 'for the purpose of making a general inquiry' or for some other legitimate reason, they are 'free to keep their eyes open,' and thus 'it is permissible for them to look into a garage or similar structure from that location.' 1 LaFave, Search & Seizure, § 2.3, p. 318.

Courts have upheld police entries onto driveways, carports, front walks, and porches as nonintrusive.... In each case, the courts found that the officers' observations were made from a normal means of ingress or egress.

absence of an accompanying trespass is merely a factor to consider in determining the reasonableness of a visual intrusion." *Commonwealth v. Soychak*, 221 Pa.Super. 458, 462, 289 A.2d 119, 122 (1972).

■ In light of the above cases and the minimal trespass involved in the instant case, we find that, even assuming that Officer Casciola and the garage were located within the curtilage, Officer Casciola's presence in front of the garage door was reasonable. Succinctly, it was reasonable for Officer Casciola to investigate the anonymous tip by going to appellant's home and knocking on his front door; and, upon learning that appellant (with whom he wished to speak) was in the garage, it was reasonable for Officer Casciola to follow appellant's wife to the garage door in order to speak with appellant. Hence, his presence in front of the garage door must be deemed to be legitimate and lawful.

### 3.

We are not of the opinion that consent was required for Officer Casciola to follow Mrs. Carelli from the front porch to the garage door when she indicated her husband was in the garage. We note, however, that this Court has implied consent to follow in similar circumstances. *See Commonwealth v. Daniels, supra*, 421 A.2d at 723 (suspect who did not answer an investigating officer's question but silently re-entered apartment was deemed to have impliedly consented to the entry of the police officers into the apartment in order to continue the questioning) (per Brosky, J.).

Even assuming consent was required, the fact that Officer Casciola did not disclose to appellant's wife his primary reason for wanting to speak with appellant, and in fact deceived her in this regard, would not render her implied consent invalid and his presence in front of the garage door

387 N.W.2d at 811 n. 1 (Cavanaugh, J., concurring; Riley, J., joins). (Citations omitted); *accord California v. Greenwood, supra* (the police cannot reasonably be expected to avert their eyes from evidence of criminal activity that could have been observed by any member of the public).

unreasonable. Appellant contends that under *Commonwealth v. Poteete,* 274 Pa.Super. 490, 418 A.2d 513 (1980), Officer Casciola's deception as to why he wanted to speak to appellant vitiated any implied consent by appellant's wife for Officer Casciola to follow her to the garage. We cannot agree.

The divided panel in *Poteete* held that a uniformed police officer who ostensibly entered appellant's home to continue an investigation of the theft of appellant's car was not legitimately in appellant's home (in order to meet the requisites of the plain view exception) when he failed to disclose prior to his "consensual" entry that an alternate reason for his visit was to confirm his suspicion that appellant was in possession of stolen furniture. 418 A.2d at 516–17. The *Poteete* panel majority specifically relied upon *Commonwealth v. Wright,* 411 Pa. 81, 85–86, 190 A.2d 709, 711 (1963) ("consent may not be gained through stealth, deceit, or misrepresentation, and that if such exists this is tantamount to implied coercion"). We are unpersuaded that *Commonwealth v. Poteete,* 274 Pa.Super. 490, 418 A.2d 513 (1980), remains valid precedent or that it is applicable to the instant case.

In *Commonwealth v. Morrison,* 275 Pa.Super. 454, 418 A.2d 1378 (1980), *cert. denied sub nom. Morrison v. Pennsylvania,* 449 U.S. 1080, 101 S.Ct. 863, 66 L.Ed.2d 804 (1981), filed two months after *Poteete,* an *en banc* panel of this Court found that an undercover police officer's use of a ruse to gain entry into a barn to confirm suspicions that the barn was being used to store large quantities of marijuana did not vitiate consent and render the intrusion an illegal search. The *en banc* panel expressly distinguished *Commonwealth v. Wright, supra,* as having been decided prior to the announcement of the constitutional standard for Fourth Amendment waivers in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). We find *Poteete* to be equally distinguishable based upon its reliance on pre-*Schneckloth* precedent. We note that in *Commonwealth v. Markman,* 320 Pa.Super. 304, 313, 467 A.2d 336,

341 (1983), a panel of this Court, citing *Morrison* and not *Poteete,* stated unequivocally, "[c]onsent may be deemed voluntary even when procured by a police officer who misrepresents both his identity and purpose for making the search." We note that Judge Hoffman, who authored the majority opinion for the divided panel in *Poteete,* joined the opinion in *Markman.*

The *en banc* panel in *Commonwealth v. Morrison* did not, as the dissent suggests, improperly overrule our Supreme Court's decision in *Commonwealth v. Wright.* Review of the decision in *Wright* reveals that no state constitutional claim was presented and that the case was decided entirely and exclusively upon application of *federal* case precedent. *Commonwealth v. Wright, supra,* 190 A.2d at 710–711. Thus, the *en banc* panel in *Morrison* acted within its authority in following subsequent federal cases rather than *Wright*'s previous construction of the federal law. We note that in *Commonwealth v. Brown,* 437 Pa. 1, 261 A.2d 879 (1970), decided after *Wright* but prior to *Schneckloth* or *Morrison,* our Supreme Court declined to apply *Wright*'s total proscription on the use of deception, acknowledged that police had been granted broad but not unlimited powers to use deception in gaining consent to search, and specifically held that whatever the limits on the use of ruse and deception may be, it did not require suppression of a murder weapon acquired by a uniformed police officer from a suspect by means of deceit as to the purpose for wanting the gun. Though *Wright* has not been expressly overruled, its vitality as precedent has been substantially eroded if not eliminated.

Moreover, we note that in the context of *Miranda* waivers and confessions, the United States Supreme Court has recently explained that:

This Court has never held that mere silence as to the subject matter of an interrogation is "trickery" sufficient to invalidate a suspect's waiver of *Miranda* rights, and we expressly decline so to hold today.

\* \* \* \* \* \*

'[W]e have never read the Constitution to require that the police supply a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights.'... Hence, the additional information could affect only the wisdom of a *Miranda* waiver, not its essential voluntary and knowing nature.

*Colorado v. Spring,* 479 U.S. 564, 575–77, 107 S.Ct. 851, 858–59, 93 L.Ed.2d 954, 967 (1987); *accord Colorado v. Connelly,* 479 U.S. 157, 169–170, 107 S.Ct. 515, 523–524, 93 L.Ed.2d 473 (1986); *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). We find that an appropriate analogy may be drawn to the waiver of Fourth Amendment rights by appellant's wife's initial implied consent to permit Officer Casciola to follow her to the garage.

We also find *Poteete* distinguishable from the instant case in that *Poteete* involved permission to enter a home, while the instant case involves, *at most,* silent consent to follow appellant's wife from the front door of a home to the garage door (assuming, of course, that any consent was required).

With regard to whether valid consent was given by appellant's wife for the later search of the garage and seizure of evidence, we note that the only references to the consent given by Mrs. Carelli (appellant's wife) which appear in the record are as follows:

Q. Okay, you had a consent to search the garage, is that correct?

A. That's correct.

Q. And in the garage you found the vehicle owned by Mr. Shriver, is that correct?

A. That's correct.

(N.T. 6/14/84 at 28) (cross-examination of Officer Lawrence Garner); and:

Q. Did you eventually locate the registration certificate?

A. No, not at this point. Not until Officer Garner came over to the scene and we proceeded into the house to talk with Mrs. Carelli who is the only one available at

that time. She stated her husband was not there and we talked to her and she gave us a consent to search the garage. Myself, Officer Garner, and two state troopers went into the garage and removed this vehicle from the garage.

(N.T. 6/14/84 at 32) (direct examination of Officer Casciola). Thus, the only statements of record upon this subject are the *unchallenged assertions* of two Commonwealth witnesses that consent to search was given. The assertions were not contested at trial; and no evidence has since been adduced to suggest the consent was not given or that it was invalid; and therefore, the vague suggestion of possible coercion must be rejected. *Cf. Commonwealth v. Kelly*, 235 Pa.Super. 299, 302–03, 341 A.2d 141, 143 (1975) (coercion would not be implied based solely upon request for consent by a uniformed police officer). Appellant has clearly failed to meet his burden to establish the merit of his underlying suppression claim in this respect. *See Kitrell v. Dakota, supra.* It may well be that we could *imagine* quite easily evidence which would have brought the unchallenged assertions into doubt; nonetheless, it is not for an appellate court to speculate upon matters not in evidence. *Commonwealth v. Griscavage, supra.*

### 4.

The appellant argues that in light of the detailed anonymous tip and Officer Casciola's deliberate effort to look over appellant's shoulder into the garage, the inadvertence requirement cannot be met. We cannot agree.

Initially, we note that the applicability of the inadvertence requirement to the instant case is uncertain. It is clear that the inadvertence requirement applies when a warrantless seizure of evidence located within a protected area is to be made and ordinarily does not apply when an unassisted observation of a protected area is made from outside a protected area. However, it is unclear whether the requirement applies to mere observation of evidence made by a police officer reasonably located at a vantage point within a protected area. *See* LaFave, *supra*, 10 Crim.L.Bull. at

25–26 (the purpose of the inadvertence requirement is to safeguard possessory interests, not privacy). *But see Commonwealth v. Adams,* 234 Pa.Super. 475, 479, 341 A.2d 206, 208 (1975) (*dicta,* if "view" takes place after physical intrusion then objects will be admissible only if view was inadvertent).

Nonetheless, we find that, assuming "inadvertence" is required, it is present in the instant case. While Officer Casciola had *reasonable suspicions* that evidence of a crime might be discovered on the basis of the *anonymous tip,* he did not *know* that evidence was located in the garage nor did he have *probable cause* for a search of the garage. *Cf. Commonwealth v. Sorrell,* 319 Pa.Super. 103, 465 A.2d 1250 (1983). The deliberate observation of an area in which a police officer has reasonable suspicions, *but not probable cause,* to believe evidence of a crime might be discovered, is "inadvertent" as that term is used in the context of the plain view exception. *See Commonwealth v. Casuccio,* 308 Pa.Super. 450, 469, 454 A.2d 621, 630–31 (1982); *Commonwealth v. Terra,* 292 Pa.Super. 250, 260, 437 A.2d 29, 34 (1981); *accord* Moylan, *supra,* at 1083.

5.

■ Finally, we note that the third component of the orthodox statement of the plain view exception—that the probable evidentiary value of the evidence be immediately apparent—does not apply to cases involving mere observation as opposed to a search or seizure of the evidence. *See Commonwealth v. Weik, supra,* 360 Pa.Superior Ct. at 564, 521 A.2d at 46; *see also Arizona v. Hicks,* 480 U.S. 321, 107 S.Ct. 1149, 94 L.Ed.2d 347 (1987) (movement of stereo to reveal the serial number constituted a search rather than mere observation based upon movement of the stereo); *Commonwealth v. Norris,* 498 Pa. 308, 316, 446 A.2d 240, 250 (1982) (police executing an arrest warrant were lawfully in position to view items laying about in the bedroom but not to search, by lifting a mattress, and seize evidence not in plain view).

Thus, we find that even assuming, *arguendo,* that Officer Casciola trespassed on the curtilage and looked deliberately

into a private area (the interior of the garage), his presence in front of the garage door was nonetheless reasonable and his view of the stolen truck was constitutional under the circumstances of this case. Hence, appellant's ineffectiveness claim is without merit.

## IV.

■ Moreover, regardless of the underlying merit of the suppression claim, appellant's ineffectiveness claim must fail based upon the existence of an objectively reasonable tactical basis for counsel not to have pursued the suppression claim. Succinctly, counsel reasonably chose between two basically contradictory theories of defense.

In this case, counsel could seek to establish that Officer Casciola violated appellant's actual and reasonable expectation of privacy as to the inside of the garage, or he could seek to establish that the stolen truck was put in the garage by appellant's erstwhile friend, Mr. Mullaney, and that appellant did not know the truck was stolen. While counsel could have arguably pursued both theories (a man can undoubtedly have nothing to hide and still actively seek to preserve his privacy), to forcefully present one claim in this case would necessarily weaken the other.

We disagree with the dissent's suggestion that counsel had nothing to lose and everything to gain by pursuing a suppression motion. Appellant's suppression testimony could be used for impeachment purposes at trial. *See Commonwealth v. Sparrow*, 471 Pa. 490, 370 A.2d 712 (1977); *Commonwealth v. Kennedy*, 271 Pa.Super. 206, 215, 412 A.2d 886, 890 (1979). By pursuing a suppression motion, counsel would have risked undermining appellant's theory of defense on the merits of the charges. In order to fully support the theory of defense, counsel sought to establish free access by Mr. Mullaney to the garage, and the absence of any conduct suggesting that appellant knew that the truck was stolen, *e.g.* appellant quickly closing the garage door to prevent Officer Casciola from seeing the stolen truck. Any evidence suggesting that appellant tried

to preserve the privacy of the garage could have been construed by the jury as evidence that appellant knew that the truck was stolen.

Moreover, disclosure by appellant during a suppression hearing that he permitted free access to the garage by numerous persons, he left the garage door open two feet when he entered the garage on the night in question, and that the door remained open while he talked with Officer Casciola for three minutes (facts to which he testified at trial), would have substantially undermined any assertion of an actual and reasonable expectation of privacy as to the interior of the garage, thereby substantially reducing any likelihood of success on a suppression motion.

The existence of the above objectively reasonable *tactical* basis for counsel's decision to forego the suppression claim requires that appellant's ineffectiveness claim regarding the suppression motion must fail. *See Commonwealth v. Petras, supra.*

## V.

Finally, we find no merit in appellant's claims of ineffectiveness predicated upon counsel's alleged error in failing to object to testimony by the police officer witnesses concerning out-of-court statements alleged to have been inadmissible hearsay. Specifically, appellant objects to Officer Garner's testimony regarding the police radio report announcing the theft and the content of the anonymous tip and appellant's wife's statement to Officer Casciola that appellant was in the garage.

First, the statements were not hearsay as none of the statements were admitted to prove the truth of the matter asserted therein; rather, they were properly admitted for the purpose of establishing the reasons for the police officers' courses of conduct during their investigation. *Commonwealth v. Ryan*, 253 Pa.Super. 92, 384 A.2d 1243 (1978). Alternately, we find no reasonable probability that but for the admission of those statements or the absence of a limiting instruction regarding those statements, the out-

come of the trial would have been more favorable to appellant; consequently, appellant's ineffectiveness claims must fail. *See Commonwealth v. Petras, supra.*

## CONCLUSION

Because appellant failed to meet his burden to establish ineffective assistance of counsel, we affirm the order denying post-conviction relief.

BROSKY, J., files dissenting opinion.

BROSKY, Judge, dissenting:

I respectfully dissent. I find merit to appellant's initial contention of ineffectiveness, pertaining to the failure of trial counsel to seek suppression, and would vacate and remand for a new trial.

As noted by the majority, it is well settled that a convicted defendant may not prevail upon a claim of ineffective assistance of counsel unless he is able to demonstrate: (1) that the issue underlying the ineffectiveness claim is of arguable merit; and (2) that the course of action chosen by counsel had no reasonable basis, independent of hindsight, in the promotion of defendant's interests. *Commonwealth v. Brandt,* 353 Pa.Super. 250, 253, 509 A.2d 872, 874 (1986); *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967). Furthermore, assuming the defendant is able to meet this two-pronged test, he must then be able to demonstrate that the claimed ineffectiveness so prejudiced his defense that he did not receive a fair trial. *Commonwealth v. Pierce,* 345 Pa.Super. 324, 498 A.2d 423 (1985), aff'd 515 Pa. 153, 527 A.2d 973 (1987).

Moreover, I concur in the majority's position that, while a trial court memorandum or opinion, setting forth its finding of fact as a PCHA court, would have been preferable, the record below relied upon by appellant provides this Court with an adequate factual scenario to determine the underlying merit of appellant's suppression argument.

It is here, however, that I part company with the majority, beginning with the appropriate standard of review.

The majority begins by framing the standard of review below as one in which the PCHA court, sitting as a trier of fact, was free to believe "all, part, or none" of the evidence of record.[1] From this, the majority concludes that this Court may now consider all evidence of record, "from whatever source", that supports the finding of the PCHA court. This approach is clearly contradictory to our standard of review as an appellate court where suppression issues are involved. In determining whether evidence should have been suppressed, our Court is to consider only the evidence of the appellees (herein, the Commonwealth), and so much of the evidence of the appellant (herein, the defendant) which, as read in the context of the record of a whole, *remains uncontradicted. Commonwealth v. White,* 358 Pa.Super. 120, 123, 516 A.2d 1211, 1212 (1986); *Commonwealth v. Otto,* 343 Pa.Super. 457, 460, 495 A.2d 554, 555 (1985). Thus, where appellant's testimony at trial is directly contradictory to, say, Officer Casciola's, it is Officer Casciola's testimony that is to be credited, even if that testimony is ultimately beneficial to appellant's suppression claim.[2]

**1.** In support of its position, the majority cites *Commonwealth v. Arms,* 489 Pa. 35, 39, 413 A.2d 684, 686 (1980). However, as the statement of law in *Arms,* concerning function of the trier of fact, pertained to the propriety of our Court disturbing a jury verdict, based upon an assessment of witness credibility, and did not involve either suppression issues, or our Court's scope of review in suppression matters, *Arms* is essentially inapplicable.

**2.** The majority suggests that my approach to the standard of review flies in the face of "common sense", in that it would require us to ignore relevant, albeit contradicted, testimony from appellant that arguably supports the Commonwealth's position as appellee, on suppression. However, it is not the function of an appellate court to refashion its well defined standard of review, under the guise of "common sense", in order to achieve a somewhat desirable result, i.e. the affirmance of a conviction and the avoidance of retrial. Where the Commonwealth has undermined its own position through Commonwealth testimony, I cannot accept that it is our function to circumvent our scope of review, and repair the flaws in the Commonwealth's case with the contradicted testimony of the defendant.

Reviewing the operative facts, then, as presented by the evidence of the Commonwealth, and so much of appellant's testimony as is uncontradicted by the Commonwealth, the following scenario surfaces: On March 2, 1984, a pick-up truck belonging to one Gerald L. Shriver was stolen from the Washington Mall parking lot. Officer Lawrence Garner of the South Strabane Police Department received word that an anonymous informant had followed the stolen vehicle to a white garage, adjacent to a large, white frame house, on Wabash Avenue in Hickory. Officer Garner radioed the anonymous informant's tip to Officer Dean Casciola of the Mount Pleasant Police Department, who then proceeded to the Wabash Avenue location to investigate. Upon arriving at the house described by the informant, Officer Casciola was greeted outside the house by Sandra Carelli, appellant's wife. Officer Casciola informed Mrs. Carelli that he had received a noise complaint from their neighbors,[3] and wanted to speak to her husband. Mrs. Carelli replied that her husband was in the garage, and that she would get him. Officer Casciola did not wait for Mrs. Carelli to return, but instead accompanied her to the garage. She knocked on the garage door, and appellant opened the door to exit. When appellant was only partially through the doorway, Officer Casciola approached appellant to shake his hand, and proceeded to look over appellant's shoulder. Though appellant attempted to close the door quickly, Casciola was able to see part of a pick-up truck, matching the description of the stolen vehicle, in the garage. Casciola did not mention to either appellant or his wife, at that time, that he was also there to investigate a stolen vehicle complaint.

After spotting the stolen pick-up truck in appellant's garage, Casciola radioed Officer Garner. Later that evening, Garner arrived with two state troopers. Casciola, Garner and the troopers proceeded to the house, and spoke with Mrs. Carelli, who stated that her husband had left.

3. A noise complaint had been lodged by the Carellis' neighbors the previous day.

They obtained her consent to search the garage, and found the stolen pick-up truck partially disassembled therein. They removed the truck from the garage that night.

The majority's factual scenario is at odds with the above in two significant respects, both derived from appellant's testimony. For one, the majority states that appellant had left the garage door ajar approximately two feet prior to Officer Casciola's arrival; this is a clear contradiction to Casciola's testimony that appellant had to open a closed door in order to exit the garage. Secondly, the majority asserts that Casciola was able to see the entire truck upon appellant's exit; however, this "fact" is derived from appellant's unsubstantiated beliefs only, and is, once again, directly in conflict with Casciola's own testimony that he was able to see only the back end and right side of the truck. (N.T., p. 33).

While these two discrepancies may on the surface appear to be small, both play a substantial role in the difference between my analysis and the majority's analysis of the fourth amendment considerations in this case. I note these discrepancies now as a preface to my divergent view as to how the fourth amendment applies *sub judice.*

Appellant claims that Officer Casciola's view into his garage constituted an illegal search which would have required suppression of the truck and various tools as the fruits of an illegal search. In opposition, the Commonwealth avers that the plain view doctrine permitted Officer Casciola to look over appellant's shoulder and make a warrantless visual "search" of appellant's garage. I reject the Commonwealth's argument that the plain view doctrine validates Officer Casciola's intrusion.

There are two distinct lines of cases which fall under the plain view doctrine. The first line of cases involves those situations in which the warrantless view takes place *after* an intrusion into a constitutionally protected area. Under this line of cases, fourth amendment protections apply so as to make the view a "search", and objects sighted in "plain view" are admissible only if: (1) the original intrusion into

the constitutionally protected area was justified by consent, hot pursuit, warrant, or other; and (2) the view of the objects in question was inadvertent. See *Commonwealth v. Chiesa*, 329 Pa.Super. 401, 478 A.2d 850, 852 (1984), citing *Ker v. California*, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963).

The second line of cases involves those situations in which the view takes place *before* any intrusion into a constitutionally protected area. Such a view does not constitute a fourth amendment "search", and inadvertent discovery of any objects in plain view is no longer required. *Id.*

Clearly, then, analysis must begin with a determination as to whether Officer Casciola's view into appellant's garage took place before or after any intrusion into a constitutionally protected area.

Traditionally, the fourth amendment protection from unreasonable searches and seizures has been presumed to secure the privacy of an individual in his own home; the home has been the prototype of a constitutionally protected area. *Commonwealth v. Flewellen*, 475 Pa. 442, 446, 380 A.2d 1217, 1220 (1977). Moreover, the protection generally accorded one's home has been extended to include "curtilage" as well:

> "Curtilage ... means a small piece of land, not necessarily enclosed, around a dwelling house and generally includes buildings used for domestic purposes in the conduct of family affairs ..." *Commonwealth v. Cihylik*, 337 Pa.Super. 221, 231, 486 A.2d 987, 992 (1985), citing *United States v. Wolfe*, 375 F.Supp. 949, 958–59 (E.D.Pa. 1974).

Whether a given area is within the protected curtilage of one's dwelling, will depend upon a number of factors, including its proximity to the dwelling, whether it is within the enclosure surrounding the dwelling, and its use as an adjunct to the domestic economy of the family. *Cihylik*, supra, 337 Pa.Superior Ct. p. 230, 486 A.2d pp. 991–92.

However, as the oft-repeated doctrine of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), makes clear, the concept of "place", while of relevance to a

determination as to whether an area shall be recognized as constitutionally protected, is not dispositive of the question:

"[T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [citations omitted]. But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected." [citations omitted]. *Id.* at 351–52, 88 S.Ct. at 511.

Hence, where an individual fails to take reasonable measures to safeguard an area, normally thought to be private, from prying eyes, he may not be free, even in his own home, from visual intrusion by an investigating officer. As long as the officer is situated at a lawful vantage point outside the area, any incriminating evidence the officer sights within the area will not be subject to suppression, as the individual who has failed to shield the area from public view has, in effect, surrendered his privacy, and is precluded from any claim that an illegal "search" has taken place. *United States v. Dunn,* 480 U.S. 294, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326 (1987). The evidence will be admissible pursuant to the second line of cases under the "plain view" doctrine. *Chiesa,* supra.

By contrast, where an individual takes measures to safeguard his privacy in an area not generally thought to be private, that area may nonetheless be entitled to constitutional protection, provided society is prepared to acknowledge that individual's expectation of privacy as reasonable under the circumstances. An intrusion into that area by an investigating officer, and a subsequent sighting of incriminating evidence within that area, will constitute a "search". The evidence will be subject to suppression if the criteria specified in the first line of "plain view" cases, *Chiesa,* supra (i.e. intrusion must be justified and evidence must be discovered inadvertently), are not satisfied. *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 2038–39, 29 L.Ed.2d 564 (1971).

To summarize, then, the pivotal consideration in determining whether an area is constitutionally protected is not the place involved, though certain places such as homes and their curtilage are often accorded fourth amendment protection. The key inquiry, rather, is whether the individual suspect harbors a reasonable and justifiable expectation of privacy with respect to the area in question, and seeks to ensure his privacy by the taking of measures to exclude prying eyes. *Commonwealth v. Weimer*, 262 Pa.Super. 69, 74, 396 A.2d 649, 651 (1978), citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Commonwealth v. Busfield*, 242 Pa.Super. 194, 363 A.2d 1227, 1228–29 (1976); *Commonwealth v. Soychak*, 221 Pa.Super. 458, 289 A.2d 119, 122 (1972). Such a determination must be made on an individual basis, as the facts surrounding the reasonableness of a suspect's expectations, and the strength of that belief, as evidenced by any measures taken to safeguard those expectations, will necessarily vary from case to case. *Weimer*, supra.

For instance, in the *Busfield* case, this Court determined that the defendant had failed to demonstrate an expectation of privacy as to the kitchen of his own residence, and had therefore surrendered any claim to fourth amendment protection. The defendant had been conducting marijuana transactions from his residence, and, on the evening in question, was observed through a drawn curtain, by police officers lawfully positioned on adjacent property, to be packaging marijuana, along with three male accomplices. The curtain in question was of a very sheer material, and permitted clear observation into the kitchen; moreover, a window blind was available, but left undrawn. This Court held that the defendant's failure to draw the blind, in light of the sheer nature of the curtain, had exposed his activities to public view, negating any reasonable expectation of privacy: "The law will not shield criminal activity from visual observation when the actor shows such little regard for his privacy." *Busfield*, supra, 242 Pa.Superior Ct. at p. 199, 363 A.2d at p. 1229.

In *Soychak*, on the other hand, this Court affirmed the suppression of evidence gained through what the Court determined to be an illegal search of a private billiards club. The police had received information that the club was involved in gambling operations, and, pursuant to this tip, had stationed an officer on the roof of the club. The officer observed, through a louvered exhaust fan, the defendants' attempt to destroy gambling paraphernalia. This Court held that the defendants had demonstrated a reasonable expectation of privacy as to the interior of the club through the employment of two reinforced doors and a doorman, and, moreover, had not abandoned that expectation through the opening of the louvers on the exhaust fan, as the louvers had to remain open while the fan was in operation, and the fan was located in a bathroom, ordinarily presumed to be private. As such, the officer on the roof has intruded [4] into a protected area, without justification, and had illegally "searched" the interior of the bathroom.

Finally, in the *Weimer* case, this Court was faced with a factual scenario similar to that in *Soychak*. The *Weimer* defendants had been conducting gambling operations at their club. Pursuant to anonymous tips, the state police, on two separate occasions, dispatched two uniformed officers to make a warrantless investigation of the premises. The troopers were admitted without any showing of membership, despite the club's stated policy of restricting entry to members. On the latter visit, gambling paraphernalia was observed, and the defendants were arrested for possession of gambling devices. In an attempt to suppress the devices confiscated, defendants relied upon our decision in *Soychak*. The suppression judge agreed with their rationale, and the Commonwealth took a direct appeal. This Court reversed,

---

**4.** The *Soychak* Court noted that, while a physical intrusion by an officer into a protected area is the usual scenario in illegal search cases, the absence of a physical intrusion does not per se demonstrate that a police surveillance was reasonable. Citing *Katz*, they stated "even a non-trespassory surveillance can be unreasonable and therefore unconstitutional ... the presence or absence of an accompanying trespass is merely a factor to consider in determining the reasonableness of the visual intrusion." *Soychak*, supra.

stating in part that the factual situation presented was more akin to *Busfield* than *Soychak*, in that the defendants had been too lax in enforcing their purported security measures to deny access to non-members, thereby defeating any claim that the defendants had a reasonable and justifiable expectation of privacy as to the interior of the club.

Turning now to the matter *sub judice*, I believe the factual scenario presented indicates that appellant had a reasonable and justifiable expectation of privacy with respect to his garage, and, more importantly, took measures to safeguard that privacy, in a manner more akin to *Soychak* than to either *Busfield* or *Weimer.*

As a starting point, I encounter no difficulty, as does the majority, in concluding that appellant's garage was part of the protected curtilage of his home. The garage is described in the record as "adjacent" to the Carellis' dwelling,[5] upon residentially zoned property (N.T. pp. 30, 38).

The majority finds the word "adjacent" to "only vaguely" indicate proximity to the house, and footnotes to the Webster's Ninth Collegiate Dictionary (1986) discussion distinguishing "adjacent", "adjoining", and "contiguous", and "juxtaposed". The Webster's *Seventh* New Collegiate Dictionary (1972) contains a similar discussion, comparing and contrasting "adjacent" with "adjoining", "contiguous", and "abutting". As I would doubt that a common term such as "adjacent" has radically changed meaning in the past fourteen years, I find the following portion of the 1972 discussion instructive:

> ADJACENT may or may not imply contact but always implies absence of anything of the same kind in between
> . . .

In light of the above, I fail to find the term "adjacent" too "vague" to draw the common sense inference that the

---

5. I note only in passing that appellant did not own his residence, or the accompanying garage, but, rather, rented the premises. However, it is well established that a tenant has an expectation of privacy, with respect to rented premises, that is understood by society, and hence "reasonable." See *Commonwealth v. Lowery,* 305 Pa.Super. 66, 451 A.2d 245, 247 (1982).

garage was in sufficiently close proximity to qualify as part of the curtilage.

More significantly, however, appellant did not abandon his privacy, but, on the contrary, took reasonable measures to prevent intrusion by prying eyes. It is uncontradicted, in the record at trial, that the windows to the garage were boarded, and that access to the garage was possible only through the garage door. Moreover, according to the testimony of the Commonwealth's own witness, Officer Casciola, appellant, upon exiting the garage, attempted to protect the garage and its contents from the officer's visual inspection by quickly closing the door after him. (N.T., p. 32). Such behavior does not constitute the type of lax enforcement of privacy demonstrated by the sheer curtain in *Busfield*, or the "open door" policy in *Weimer*. Rather, it is more akin to *Soychak*, wherein the defendants took specific measures to shield their actions from observation, and were exposed only through the taking of unavoidable means to operate the bathroom fan, i.e. the opening of the louvers. Here, appellant took security measures, and exposed the interior of his garage only when it became unavoidable to shield it from view i.e. upon opening the garage in order to exit and respond to police questioning.

It is here that the majority's differing construction of the facts comes into play. The majority relies, in part, upon appellant's testimony to conclude that appellant abandoned any expectation of privacy by: (1) leaving the door ajar by two feet; and (2) thereby permitting Officer Casciola to see the entire truck. The majority's reliance is misplaced for two reasons.

Initially, presuming that the majority has construed appellant's testimony correctly, i.e. as contradictory to that of Casciola's, the majority has failed, as noted previously, to apply the correct standard of review. Where the testimony given by appellant contradicts that of Casciola, it is the testimony of Casciola that is to be credited. *White*, supra; *Otto*, supra. This would seem particularly apropos with respect to how much of the stolen truck was visible to

Casciola; as appellant could only have assumed how much of the truck was visible to Casciola, Casciola's testimony that he could only view a limited portion of the truck would certainly seem the more reliable testimony.

Moreover, I cannot agree that appellant's testimony was so inherently contradictory to that of Casciola:

Q. Your garage has windows, is that correct?

A. But they're boarded up.

Q. *And the garage door was open?*

Q. *About two foot.*

Q. *And you opened it whenever you greeted him?*

A. *Chief Casciola, no. When I went in I opened them up and turned the lights on and walked over to my box and got my stuff* and I was right where I was getting my stuff and my wife said, 'Ron, there is a police officer out there who would like to see you.' And I said, 'Alright, I'll be right out.' (N.T., p. 64).

The majority gleans from the above exchange that appellant opened the door, and left it ajar immediately prior to Casciola's arrival. However, the time sequence involved appears to me somewhat vague. While it is certain that appellant had opened the door, in order to enter the garage, the above does not clarify whether appellant left the door ajar before or after Casciola's arrival. The lack of clarity is even more apparent when reviewing appellant's testimony only moments before:

Q. And did you have some conversation with him as you were coming out of the garage?

A. First, my wife, she just called and says, she says, "Ron, there is an officer out here that would like to talk to you." So, I just said, "Alright, I'll be out in a minute." I had grabbed my tools and I just walked outside. *The garage door was slid like two feet open, you know, and the lights were still on.* (Emphasis added) (N.T., p. 57).

As the above-emphasized assertions demonstrate, it is just as likely that appellant was trying to say that the door was opened and left ajar two feet upon his exit from the garage.

As the majority's construction of the rather vague testimony given by appellant brings that testimony directly into conflict with Casciola's recollection of the sequence of events, I would be loathe to construe appellant's testimony in such a manner, and, more importantly, to rely upon that construction to conclude that appellant surrendered his privacy as to the interior of the garage. All are agreed that appellant quickly closed the garage door behind him upon exiting, an action inconsistent with a surrender of privacy.

The majority also construes a surrender of privacy from the uncontradicted testimony at trial that appellant's friends and relatives frequently used the garage, with appellant's understood permission. However, an invitation to some is not an invitation to all. As *Soychak* and *Weimer* indicate, an individual does not abandon an expectation of privacy by permitting a select group to come into the protected area, even if that select group be a large one, such as the membership roster of a private club. The important factor is whether an individual who has given permission to others attempts to exclude official prying eyes. Here, appellant closed the garage door quickly behind him to exclude Casciola's prying eyes. I fail to appreciate the significance of appellant's prior consent to others, in light of his obvious denial of consent, by conduct, to any visual intrusion by Casciola.

Thus, I conclude that Casciola's visual intrusion into appellant's garage constituted a "search" of a constitutionally protected area, similar to that in the *Soychak* case. Further analysis must proceed, then, in accordance with the first line of cases under the "plain view" doctrine, often referred to as the "plain view exception" cases. It must now be determined if the intrusion was both: (1) justified, and (2) inadvertent.

Initially, I do not believe that Casciola's presence at the garage door was justified by any implied consent he obtained from appellant's wife to follow her to the door.

When seeking to justify a search on consent grounds, the Commonwealth has the burden of proving, by a preponderance of the evidence, that the consent was voluntarily given. See *Commonwealth v. Walsh*, 314 Pa.Super. 65, 75, 460 A.2d 767, 772 (1983), citing *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797, 802 (1968); see also *Commonwealth v. Reynolds*, 256 Pa.Super. 259, 389 A.2d 1113, 1118 (1978). The issue of whether consent has been freely given is a question of fact which must be determined in each case from the totality of the circumstances. Pertinent factors may include the education, intelligence, and experience of the consenter, and the degree to which the consenter understands investigating procedures. *Walsh*, supra, 314 Pa.Superior Ct. at pp. 74, 75, 460 A.2d at pp. 771, 772. Further, it is well established that consent may not be gained through stealth, deceit, or misrepresentation; a consent gained through such measures is neither knowing nor intelligent, and is tantamount to a consent obtained by means of implied coercion or duress. *Id.*

This does not mean that every consent obtained through the employment of an undercover agent, or a planted informant, is automatically vitiated as the product of misrepresentation. It has been recognized that certain crimes, by their very nature, such as vice, racketeering, and narcotics trafficking, require the police to employ ruses and deceptions to investigate. See *Commonwealth v. Poteete*, 274 Pa.Super. 490, 418 A.2d 513, 516, 517 (1980), citing *Hoffa v. United States*, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). Rather, it is where an officer, who identifies himself as such, misrepresents his purpose in order to gain entrance into a private area, such as one's home, that any consent given has been rendered involuntary. It is generally recognized that officers, by virtue of their status and authority, exercise some degree of coercion whenever they make requests in their official capacity; this coercion, cou-

pled with deception, deprives a home owner of the ability to make an intelligent assessment of the risks involved in consenting to entry, and thereby incapable of rendering a voluntary, intelligent, and knowing consent. *Walsh,* supra, 314 Pa.Superior Ct. at p. 75, 460 A.2d at p. 772; *Poteete,* supra, 274 Pa.Superior Ct. at p. 496, 418 A.2d at p. 516.

Before applying the above law to the facts *sub judice,* the majority's position that *Poteete* is no longer valid precedent must be addressed.

The majority cites *Commonwealth v. Morrison,* 275 Pa. Super. 454, 418 A.2d 1378 (1980) (en banc), for the proposition that *Poteete,* as the progeny of *Commonwealth v. Wright,* 411 Pa. 81, 190 A.2d 709 (1963), is no longer precedential, in that *Wright* was decided prior to *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). In *Schneckloth,* the U.S. Supreme Court formulated a test for voluntariness of consent to a search, wherein any consent "coerced by threats or force, or granted only in submission to a claim of lawful authority", would be involuntary. *Id.* at 227, 233, 93 S.Ct. at 2048, 2051. Noting that *Wright* was decided on the basis of pre-*Schneckloth* federal case precedent, and that the *Morrison* majority adopted the *Schneckloth* test for voluntariness, the majority herein concludes that stealth and misrepresentation may no longer render a consent involuntary. I disagree.

Initially, the Concurring Opinion in *Morrison* authored by Spaeth, J., and joined by Wieand, J., aptly points out that the *Morrison* majority over-extends the *Schneckloth* test in a manner clearly inconsistent with prior precedent:

"In its most obvious interpretation, the (majority) opinion seems to say that the only limits on police deception are that the deception must not amount to 'force or other coercion'.... This proposition, however, is so plainly contrary to settled law that one must ask whether perhaps the opinion is not intended to mean something else.... *Perhaps the principal difficulty with the majority's opinion is its reliance on Schneckloth (cite omitted). Schneckloth, however, is not on point....*

*In Schneckloth there was no police deception; accordingly, the Court had no occasion to address, and did not address, the issue before us." Morrison,* supra, 275 Pa.Superior Ct. at pp. 463–464, 418 A.2d at pp. 1382–83. (Emphasis supplied.)

Moreover, as our Court pointed out in *Walsh,* it is well settled that constitutional rights may be protected by a state-court system which has developed its own test for voluntariness of consent; the state has the power to impose standards on searches and seizures higher than those required by the Federal Constitution. *Walsh,* supra, 314 Pa.Superior Ct. at p. 74, 460 A.2d at p. 771, citing *Cooper v. State of California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). The *Wright* decision has never been overruled by the Pennsylvania Supreme Court, and cannot be overruled by an en banc panel of the Superior Court. Until such time that *Wright* is expressly disavowed, its prohibition against procuring consent through deceit remains the law of this Commonwealth,[6]

6. The majority cites *Commonwealth v. Brown,* 437 Pa. 1, 261 A.2d 879 (1970), for the proposition that even the Supreme Court has declined to apply the *Wright* proscription against deception, which is indicative that *Wright's* value as continuing precedent is at best questionable. This, however, ignores the basis upon which *Brown* distinguishes *Wright.*

*Brown* notes that two distinct lines of Supreme Court cases have developed pertaining to deceptive conduct in obtaining consent. The first is the *Gouled* line, based upon *Gouled v. United States,* 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921), which is cited in *Wright* for the proposition that consent gained through stealth is "tantamount to implied coercion." *Wright* supra, 190 A.2d at p. 711. The second line is the *Lopez–Hoffa–Lewis* line, based upon the holdings in, respectively, *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Hoffa v. United States,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); and *Lewis v. United States,* 385 U.S. 206, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966), in which various exceptions to the *Gouled* test for consent were delineated for situations in which undercover work was involved. The *Brown* court found the *Lopez–Hoffa–Lewis* line to be applicable to the facts in *Brown,* as the defendant in *Brown* had voluntarily surrendered the gun he had used as a murder weapon, to a *known* policeman, who was "undercover" as to his *motives in wanting* the gun, i.e. he had offered to sell the defendant's gun:

Neither this Court nor any member of it has expressed the view that the Fourth Amendment protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it. *Brown,* supra, [261 A.2d], at p. 882, citing *Hoffa,* supra, 385 U.S. at 302, 87 S.Ct. at 413.

upon *Wright,* remains valid precedent.[7]

Applying, then, the *Poteete* and *Walsh* criteria to Casciola's presence at the door of the garage, I cannot find that the record below demonstrates, by a preponderance of the evidence, that Casciola followed Mrs. Carelli to the garage with her consent. All testimony at trial indicates that Mrs. Carelli said that she would "go get" her husband, and did not say "follow me". The plain meaning of "go get" certainly does not imply an invitation to be followed.[8] In the absence of any testimony to the effect that the officer was somehow invited, I cannot imagine that Mrs. Carelli did not feel pressured to permit the officer to follow her, once he began to do so. Moreover, the record is clear that Casciola misrepresented the nature of his visit, as a follow-up on a noise complaint. (N.T., p. 35). Hence, even if Mrs. Carelli's silence when Casciola followed her was not the result of pressure, the Commonwealth certainly has not demonstrated that her silence was not the result of Cascio-

7. The majority notes that *Commonwealth v. Markman,* 320 Pa.Super. 304, 467 A.2d 336 (1983) cites the *Morrison* holding pertaining to voluntariness of consent, and not *Poteete.* The majority believes this to be significant, in light of the fact that Hoffman, J., the author of *Poteete,* was on the *Markman* panel and joined in the majority opinion. However, the *Markman* panel expressly found that the officer in question, a Lieutenant Caldwell, *had not employed* fraud or deceit to obtain consent to search the premises in question. As such, the *Markman* cite to *Morrison* was dictum, and Judge Hoffman's joinder in *Markman* can in no way be construed as a disavowal of his position as the author of *Poteete.*

8. This alone distinguishes the matter *sub judice* from *Commonwealth v. Daniels,* 280 Pa.Super. 278, 421 A.2d 721 (1980), authored by this writer and cited by the majority. In *Daniels,* the police were investigating a report of a woman's screams coming from the appellant's apartment. Upon the arrival of the police, in response to police questioning, the appellant made no response whatsoever, but re-entered his apartment, leaving the door open. I found appellant's behavior under the circumstances suspicious, and held that the police had no option but to follow appellant in order to continue their interrogation.

This, of course, is a far cry from the situation herein, where appellant's wife was not silently refusing to respond to questioning, nor attempting to evade further questioning by walking away. Rather, she was attempting to bring her husband to Officer Casciola. Such behavior was not suspicious, and did not require of Officer Casciola that he follow her to the garage to continue his interrogation.

la's misrepresentation of his purpose.[9]  Were I to concede, however, that Casciola was lawfully positioned at the garage door with Mrs. Carelli's consent, I nonetheless am compelled to the conclusion that his view of the interior of appellant's garage was anything *but* inadvertent.

The United States Supreme Court has defined the term "inadvertency", for purposes of search and seizure cases, to mean that an officer must discover the incriminating evidence by accident; that is, he may not know the location of the evidence in advance of discovery, and intend to seize it, relying on the plain view doctrine as a pretext.  See *Coolidge v. New Hampshire*, 403 U.S. at 470, 91 S.Ct. at 2040 (1971); see also *Commonwealth v. Kendrick*, 340 Pa.Super. 563, 569, 490 A.2d 923, 926 (1985).

Applying this definition to the testimony adduced at trial, it is obvious that Casciola's sighting of the stolen truck was anything but inadvertent.  He was well aware, prior to his arrival at the Carelli home, that an anonymous tipster had reported the vehicle to be located in the big white garage adjacent to appellant's residence.  (N.T., p. 30).  He did not wait for Mrs. Carelli to get appellant, but walked over to the garage with her, and deliberately looked over appellant's shoulder in an attempt to determine if the vehicle within the garage matched the description of the stolen vehicle.  (N.T., pp. 30, 32).  Under such circumstances, the Commonwealth's assertions that this was an inadvertent sighting of evidence in plain view are unpersuasive.

The majority, incredibly enough, cites *Commonwealth v. Casuccio*, 308 Pa.Super. 450, 468–469, 454 A.2d 621, 630–31

**9.** The majority consistently refers to my characterization of the record, with reference to the issue of Mrs. Carelli's consent here, and at a later point in time, as the product of conjecture and speculation, and asserts that, without any testimony demonstrating coercion, appellant cannot meet his burden of proving coercion.  This, once again, is an improper approach to the standard of review.  As noted *infra.,* the Commonwealth has the initial burden of demonstrating by a preponderance of the evidence that consent was freely given; where the record does not enable the Commonwealth to meet its burden, the burden of showing coercion never shifts to the defendant.  *Walsh,* supra, 314 Pa.Superior Ct. at p. 75, 460 A.2d at p. 772.

(1982), for the proposition that, where an officer has reasonable suspicions, but not probable cause, to believe evidence of a crime will be discovered in a certain area, deliberate observation of that area will qualify as "inadvertent". This is a patent misreading of *Casuccio.* In *Casuccio,* the authorities were searching a garage for a stolen Hobart Welder, and, in the same garage, discovered a stolen trailer. While the officers knew the trailer to be stolen, they "had no way of knowing that (the trailer was) to be found on the premises to be searched". *Id.,* 308 Pa.Superior Ct. at p. 468, 454 A.2d at p. 630. The discovery of the trailer was *purely accidental.* In holding the discovery of the trailer to be admissible at trial, our Court held that "the 'plain view' doctrine permits the seizure of items found while executing a valid warrant naming other objects" provided that there is a "prior valid intrusion", and an "inadvertent" discovery of evidence, in plain view. *Id.* This does not mean that an officer may have a reasonable suspicion that a *certain* item is in a *certain* place, gain entry to that place, and claim that his discovery of the *certain* item was "inadvertent"! Such a construction of the term "inadvertent" would pervert the plain meaning of the term beyond reason.

I therefore cannot but conclude that Officer Casciola's visual intrusion into appellant's garage constituted an unlawful search of a constitutionally protected area.

However, the inquiry into the admissibility of the stolen truck does not end here. In deciding whether evidence obtained following illegal police conduct must be suppressed as a "fruit of the poisonous tree", it must be considered:

"whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Commonwealth v. Shaw,* 476 Pa. 543, 383 A.2d 496, 554, 501–02 (1978), citing *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

As the factual history to this matter indicates, Casciola later returned to the Carelli home with Officer Garner and two state troopers, and allegedly obtained the consent of Mrs. Carelli to a second "search" of the garage. It must be resolved, then, whether her consent to the second "search" was voluntary, and purged the taint of illegality remaining from the first "search". Once again, I would find that the Commonwealth failed to meet its burden of demonstrating voluntariness.

When Casciola returned with Officer Garner and two state troopers, Mrs. Carelli was home alone; the officers then "talked to her", and she gave her consent to a search of the garage. (N.T., p. 32). This scenario, in the absence of any testimony as to what the officers "talked to her" about during the second visit, militates against a free and knowing consent. There is no indication that the officers ever explained to Mrs. Carelli the true nature of their investigation, or the serious consequences of her consent. Moreover, despite appellant's absence from the home, which effectively eliminated any concern that the truck was about to be moved, the officers did not wait for appellant's return, but obtained Mrs. Carelli's consent then and there. It is difficult to imagine that Mrs. Carelli would not have felt some degree of duress from four police officers pressing her for an immediate consent; this, coupled with the fact that Mrs. Carelli, by all appearances, did not know or understand the full nature of the officer's investigation, implies a situation fraught with deceit and coercion.[10]

I therefore conclude that a motion to suppress the pick-up truck, and other items seized from appellant's garage, as the fruits of Chief Casciola's illegal visual search, would have had arguable merit. It would have been the Commonwealth's burden to prove, by a preponderance of the evidence, that the items in question were somehow admissible. Pa.R.Crim.Proc. 323 (h); *Commonwealth v. Ryan*, 300 Pa. Super. 156, 173, 446 A.2d 277, 285 (1982). Taking all the Commonwealth's evidence, and so much of the defense evidence

10. Id.

as remains uncontradicted, *Ryan*, supra, 300 Pa.Superior Ct. at p. 169, 446 A.2d at p. 283, I am of the view, as is apparent from the preceding discussion, that the Commonwealth would have encountered some measure of difficulty in satisfying its burden. A motion to suppress would have a more than reasonable chance of success. Appellant, therefore, has satisfied the first prong of the two-pronged *Maroney* test for ineffectiveness, by demonstrating that the underlying issue is of arguable merit.

The second prong of the two-pronged *Maroney* test is a showing that the course of action chosen by counsel could not have had a reasonable basis in the promotion of appellant's interests.

I would hold that trial counsel could not possibly have had a reasonable basis in failing to file a suppression motion.

To convict a defendant of receiving stolen property, the Commonwealth is required to establish: (1) possession, control, or dominion over the stolen goods by the accused; and (2) knowledge, whether actual or inferred from the circumstances surrounding receipt, on the part of the accused that the goods were, in fact, stolen. See 18 Pa.C.S. § 3925; see also *Commonwealth v. Worrell*, 277 Pa.Super. 386, 419 A.2d 1199, 1201 (1980) and *Commonwealth v. Davis*, 444 Pa. 11, 280 A.2d 119, 121 (1971). Without some evidence of possession or receipt, an accused cannot be convicted of the crime. Therefore, an attempt at suppression of items seized from appellant's garage, including the truck, would have, at its most successful, left the Commonwealth without a case against appellant. At its least successful, it could not have possibly harmed appellant's interests. Trial counsel's failure to even attempt suppression was patently unreasonable, and denied appellant effective assistance of counsel.

The majority takes the rather novel position that, as any suppression testimony by appellant, concerning measures he took to exclude prying eyes from his garage, could have been used against him at trial for impeachment purposes,

and as his theory of defense was that he did not know the truck was stolen and had "nothing to hide", the decision by trial counsel to refrain from filing a suppression motion was a reasonable tactical decision. I find this strained attempt by the majority to construe trial counsel's behavior as reasonable incomprehensible.

For one, the Commonwealth was free at trial, even in the absence of any suppression testimony, to put Casciola on the stand, and give testimony concerning the measures appellant took to safeguard his privacy. In point of fact, this is precisely what happened at trial. As such, the failure to file a suppression motion did not block the introduction of what the majority believes was incriminating evidence; it only deprived appellant of his chance to suppress the fruits of the garage search, and have the Commonwealth's case against him dismissed. Moreover, that Casciola would have given such testimony at trial, could have easily been anticipated, without benefit of hindsight, by trial counsel, if indeed such testimony was so terribly damaging to appellant's theory of defense.

More frightening, however, is the majority's underlying assumption that an individual cannot seek to exclude prying eyes from invading his privacy without having "something to hide", or taking on the appearance of guilt. Unlike the majority, I detect no inherent contradiction in appellant's theory of defense, i.e. that he did not know the truck to be stolen, and the actions appellant took to deny the world at large from examining the contents of his garage. It has always been my understanding that the fourth amendment protects all citizens, be they guilty or innocent of wrongdoing, from unwelcome police surveillance, and that the assertion of one's fourth amendment rights is not, in and of itself, indicative of criminal activity afoot.

Moving, then to the third prong of the ineffectiveness test, as set forth in *Pierce*, supra, I would find that trial counsel's ineffectiveness so prejudiced appellant that he did not receive a fair trial.

As mentioned above, the contents of appellant's garage were the sum and substance of the Commonwealth's case. To aver in this instance that the outcome of appellant's trial was not affected by the admission of the tainted evidence, and the testimony of the police officers as to how it was discovered, would be specious.

In light of the foregoing, I would find that trial counsel was ineffective as a matter of law, and that counsel's ineffectiveness so prejudiced appellant as to deprive him of a fair trial. I would vacate the judgment of sentence, and remand for a new trial.